Ascaris MAYO and Antonio Mayo,
Plaintiffs-Respondents-Cross-Appellants,†

UNITED HEALTHCARE INSURANCE COMPANY and
Wisconsin State Department of Health Services,
Involuntary-Plaintiffs,

v.

Wisconsin INJURED PATIENTS AND
FAMILIES COMPENSATION FUND,
Defendant-Appellant-Cross-Respondent,

PROASSURANCE WISCONSIN INSURANCE COMPANY,
Wyatt Jaffe, MD, Donald C. Gibson,
Infinity Healthcare, Inc. and Medical College of
Wisconsin Affiliated Hospitals, Inc.,
Defendants.

Court of Appeals

*No. 2014AP2812. Submitted on briefs November 8, 2016.
—Decided July 5, 2017.*

2017 WI App 52

† Petition for review filed.

568

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Roisin H. Bell and John N. Giftos* of *Bell Giftos, LLC*.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Daniel A. Rottier, James M. Fergal and Susan R. Tyndall* of Habush Habush and Rottier, S.C.

A nonparty brief was filed by *Anne Kearney* of the Wisconsin Medical Society, *Andrew Cook* of Michael Best and Friedrich LLP, *Lucas Thomas Vebber* of the Wisconsin Manufacturers and Commerce and *William C. Gleisner III* of the Wisconsin Association for Justice.

Before Brennan, P.J., Kessler and Brash, JJ.

¶ 1. KESSLER, J. This is an appeal stemming from a circuit court decision finding the $750,000 cap on noneconomic damages in medical practice actions, as articulated in WIS. STAT. § 893.55 (2015–16),[1] unconstitutional as it applied to Ascaris and Antonio Mayo. This is also a cross-appeal of the circuit court's finding that the statutory cap is not unconstitutional on its face. We conclude that the statutory cap on noneconomic damages is unconstitutional on its face because it violates the same principles our supreme court articulated in *Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440, by imposing an unfair and illogical

---

[1] All references to the Wisconsin Statutes are to the 2015–16 versions unless otherwise noted.

burden only on catastrophically injured patients, thus denying them the equal protection of the laws. We conclude that because Wisconsin's cap on noneconomic medical malpractice damages *always* reduces noneconomic damages *only* for the class of the most severely injured victims who have been awarded damages exceeding the cap, yet always allows full damages to the less severely injured malpractice victims, this cap denies equal protection to that class of malpractice victims whose adequate noneconomic damages a factfinder has determined are in excess of the cap. Because we conclude that the statutory cap is facially unconstitutional, we need not reach the question of whether the cap is unconstitutional as it applies to the Mayos and we do not disturb the circuit court's findings as to that question. Because the effect of our decision still entitles the Mayos to their jury award, we affirm the circuit court, albeit on different grounds.

## BACKGROUND

¶ 2. This case concerns a catastrophic injury sustained by Ascaris Mayo stemming from an untreated septic infection. Despite a hospital visit, the infection ultimately resulted in the amputation of all of her extremities. According to facts adduced at trial, in May 2011, Ascaris Mayo visited the emergency room of Columbia St. Mary's Hospital in Milwaukee for abdominal pain and a high fever. Mayo was seen by Dr. Wyatt Jaffe and a physician's assistant, Donald Gibson. Gibson included infection in his differential diagnosis and admitted at trial that Mayo met the criteria for Systematic Inflammatory Response Syndrome. Neither medical professional informed Mayo about the diagnosis or the available treatment, namely, antibiotics. Instead, Mayo was told to follow up with her

personal gynecologist for her history of uterine fibroids. Mayo's condition worsened. The following day, Mayo visited a different emergency room, where she was diagnosed with a septic infection caused by the untreated infection. Mayo became comatose and eventually became minimally responsive until she was transferred to another medical facility. Ultimately, the sepsis caused nearly all of Mayo's organs to fail and led to dry gangrene in all four of Mayo's extremities, necessitating the amputation of all of Mayo's extremities.

¶ 3. The Mayos sued Dr. Jaffe, Gibson, Infinity Health Care, Inc., ProAssurance Wisconsin Insurance Co., and the Wisconsin Injured Patients and Families Compensation Fund, alleging medical malpractice and failure to provide proper informed consent.

¶ 4. The Fund filed a motion to consider constitutionality issues pre-trial. The circuit court addressed the issue of whether the statutory cap on noneconomic damages, as stated by Wis. Stat. § 893.55(4)(d)1. ("the cap"), was unconstitutional. Ultimately, the circuit court held that the cap was not facially unconstitutional but allowed the Mayos to raise an as-applied challenge to the cap post-trial if the Mayos so chose.

¶ 5. After a lengthy jury trial, the jury found that neither Dr. Jaffe nor Gibson was negligent, but that both medical professionals failed to provide Mayo with the proper informed consent regarding her diagnosis and treatment options. As material to these appeals, the jury awarded Ascaris Mayo $15,000,000 in noneconomic damages and Antonio Mayo $1,500,000 for his loss of the society and companionship of his wife.

¶ 6. Post-verdict, the Fund moved to reduce the Mayos' jury award to the $750,000 statutory cap on noneconomic damages imposed by Wis. Stat. § 893.55.

The Mayos moved for entry of judgment on the verdict, arguing that an application of the cap would violate their constitutional rights. The Mayos also renewed their pre-trial facial challenge to the cap. The parties again fully briefed the constitutional issues and the circuit court reconsidered the constitutional questions.

¶ 7. The circuit court determined that the cap was not facially unconstitutional, but that it was unconstitutional as applied to the Mayos because it violated the Mayos' rights to equal protection and due process. Relying in part on the principles articulated by the Wisconsin Supreme Court in *Ferdon*, the circuit court made multiple findings, including: (1) application of the cap would reduce the Mayos' noneconomic damages jury award by 95.46%; (2) there is no rational basis to deprive Ascaris Mayo, who is largely immobile, of the money the jury found necessary to compensate her for her injuries; (3) reducing the Mayos' jury award would not further the cap's purpose of promoting affordable healthcare to Wisconsin residents while also ensuring adequate compensation to medical malpractice victims; (4) financially, the Fund was more than capable of honoring the jury's award without jeopardizing its solvency; and (5) applying the cap would not advance the legislative purpose of "policing high or unpredictable economic damage awards."

¶ 8. Both the Fund and the Mayos appeal the circuit court's constitutionality rulings. The Fund argues that the circuit court erred when it found Wis. Stat. § 893.55 unconstitutional as it applied to the Mayos. The Mayos argue that the circuit court erred when it determined that § 893.55 was not unconstitutional on its face. Each disputes the other's arguments.

## DISCUSSION

¶ 9. The Mayos contend that WIS. STAT. § 893.55 is facially unconstitutional because it violates the equal protection rights of catastrophically injured patients. Specifically, they contend that there is no rational basis linking the amount of the current noneconomic damages cap to the legislature's articulated purposes for enacting the cap. We agree.

### Standard of Review

¶ 10. Whether a statute is constitutional presents a question of law that we review *de novo. See State v. Cole*, 2003 WI 112, ¶ 10, 264 Wis. 2d 520, 665 N.W.2d 328. A statute's constitutionality may be challenged "as applied" or "facial[ly]." *Olson v. Town of Cottage Grove*, 2008 WI 51, ¶ 44 n.9, 309 Wis. 2d 365, 749 N.W.2d 211. A " '[f]acial challenge' " is " '[a] claim that a statute is unconstitutional on its face—that is, that it always operates unconstitutionally.' " *Id.* (citation omitted).

¶ 11. A statute is presumed to be constitutional and we resolve any doubt about the constitutionality of a statute in favor of upholding its constitutionality. *See Dane County DHS v. P.P.*, 2005 WI 32, ¶ 16, 279 Wis. 2d 169, 694 N.W.2d 344. A party challenging a statute's constitutionality must demonstrate that the statute is unconstitutional beyond a reasonable doubt. *Id.*, ¶ 18. In this context, the phrase, "beyond a reasonable doubt," establishes the force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute or its

application can be set aside. *Id.* As our supreme court explained:

> [J]udicial deference to the legislature and the presumption of constitutionality of statutes do not require a court to acquiesce in the constitutionality of every statute. A court need not, and should not, blindly accept the claims of the legislature. For judicial review under rational basis to have any meaning, there must be a meaningful level of scrutiny, a thoughtful examination of not only the legislative purpose, but also the relationship between the legislation and the purpose. The court must probe beneath the claims of the government to determine if the constitutional requirement of some rationality in the nature of the class singled out has been met.

*Ferdon*, 284 Wis. 2d 573, ¶ 77 (multiple sets of quotation marks and citations omitted).

¶ 12. "When considering an equal protection challenge to a statute, this court employs the rational basis test, unless the statute involves a suspect class or a fundamental right."[2] *Kohn v. Darlington Cmty. Sch.*, 2005 WI 99, ¶ 46, 283 Wis. 2d 1, 698 N.W.2d 794. "Equal protection guarantees that similarly-situated

---

[2] The parties dispute the level of scrutiny required in this case. The Mayos contend that a strict scrutiny level of analysis is required because they claim to have a constitutionally-protected property interest in the Fund. The Fund contends that a rational basis level of scrutiny is appropriate because, like in *Ferdon ex rel. Petrucelli v. Wisconsin Patients Compensation Fund*, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440, we are not deciding the constitutionality of all non-economic damages caps, but rather whether a particular cap is rationally related to the legislative objectives justifying the particular cap. Strict scrutiny analysis involves "fundamental interests or rights, . . . suspect classifications or discrete and insular minorities." *Thorp v. Town of Lebanon*, 2000 WI 60, ¶ 38, 235

persons are treated similarly." *State ex rel. Harr v. Berge*, 2004 WI App 105, ¶ 5, 273 Wis. 2d 481, 681 N.W.2d 282. " 'Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.' " *Tateoka v. City of Waukesha Bd. of Zoning Appeals*, 220 Wis. 2d 656, 671, 583 N.W.2d 871 (Ct. App. 1998) (citation omitted). The "basic formulation" of the rational basis test is the same in both facial and as-applied challenges. *See Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006). Under this standard, the constitution requires only that the statute creating a classification be " 'rationally related to a valid legislative objective.' " *State v. Jorgensen*, 2003 WI 105, ¶ 32, 264 Wis. 2d 157, 667 N.W.2d 318 (citation omitted).[3]

## The legislative cap on noneconomic damages

¶ 13. In *Ferdon*, the Wisconsin Supreme Court held that the previous cap on noneconomic damages,

Wis. 2d 610, 612 N.W.2d 59 (citation and one set of quotation marks omitted). We agree with the Fund that a rational basis analysis is applicable to the equal protection challenge at issue. The Mayos have not shown that they are members of a traditional suspect class or that they are being denied a fundamental right. We follow our supreme court in *Ferdon*, which applied a rational basis analysis and stated that generally capping noneconomic damages does not violate a fundamental right. *Id.*, 284 Wis. 2d 573, ¶ 65.

[3] The Mayos also raise a due process challenge to the statutory cap on noneconomic damages. We do not address the due process challenge because the analysis would be substantially similar to our analysis of the Mayos' equal protection challenge. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 477 (1989) (noting that the standard of review under the Equal Protection Clause of Fourteenth Amendment is similar to principles embodied in the Due Process Clause).

set at $350,000 (adjusted for inflation), was facially unconstitutional. *Id.*, 284 Wis. 2d 573, ¶¶ 184–187. "The court must presume that the legislature's judgment was sound and look for support for the legislative act. But the court cannot accept rationales so broad and speculative that they justify any enactment. '[W]hile the connection between means and ends need not be precise, it, at least, must have some objective basis.' " *Id.*, ¶¶ 184 (citation omitted; brackets in *Ferdon*). A jury awarded Matthew Ferdon $700,000 in noneconomic damages for medical negligence which occurred at his birth, resulting in partial paralysis and deformity in his right arm. *Id.*, ¶¶ 2, 3. After the verdict, the Fund moved to reduce the award in accordance with the statutory cap on noneconomic damages. *Id.*, ¶¶ 4, 8. The circuit court granted the motion. *Id.*, ¶ 6. Ferdon appealed on several grounds. As relevant to the issue before us, he argued that the statutory cap violated his equal protection and due process rights guaranteed by the Wisconsin Constitution. *See id.*, ¶ 9.

¶ 14. Justice Crooks, in his concurrence, succinctly explained the history of the noneconomic damages cap in Wisconsin medical malpractice cases:

> When WIS. STAT. ch. 655 was first enacted in 1975, there was no cap on noneconomic damages, but a $500,000 conditional cap that could be triggered if the Wisconsin Patient Compensation Fund's cash-flow was in jeopardy . . . . Then, in 1986, the legislature set the cap at $1,000,000. This $1,000,000 cap remained in effect until 1991, when a sunset provision became effective. There was no cap on noneconomic damages from 1991 until the legislature passed the current statutory cap of $350,000 in 1995. Thus, the caps changed from nothing, to $1,000,000, back to nothing, and finally to $350,000 over the course of 20 years.

*Ferdon,* 284 Wis. 2d 573, ¶ 190 (Crooks, J., concurring). The accuracy of Justice Crooks's historical summary was not disputed by any Justice.

¶ 15. Using a rational basis level of scrutiny, the *Ferdon* majority noted that the "standard in the equal protection context does not require that all individuals be treated identically, but any distinctions must be relevant to the purpose motivating the classification." *Id.,* ¶ 72. The court declared its goal as one to "determine whether the classification scheme rationally advances the legislative objective." *Id.,* ¶ 81. The classification the supreme court described in *Ferdon* was the "distinction between medical malpractice victims who suffer over $350,000 in noneconomic damages, and medical malpractice victims who suffer less than $350,000 in noneconomic damages .... In other words, the statutory cap creates a class of fully compensated victims and partially compensated victims." *Id.,* ¶ 82. The court observed that "the cap's greatest impact falls on the most severely injured victims." *Id.* The effect of the court's observation is to acknowledge two classifications of victims created by the cap: (1) the class of the most severely injured victims who are denied the full award for their injuries, *i.e.* noneconomic damages in excess of the cap; and (2) less severely injured victims who are fully compensated because their noneconomic damages are not reduced.

¶ 16. The Wisconsin Supreme Court acknowledged several legislative objectives for the creation of the cap, including the legislative conclusion at the time the $350,000 cap was adopted in 1995 that medical malpractice lawsuits raise the cost of malpractice insurance for providers, which in turn increases medical costs for the public. *Id.,* ¶¶ 28, 86, 110. The court cited the legislature's concern for the practice of defen-

sive medicine, as well the legislature's concern that high malpractice insurance costs discourage young doctors from establishing practices in Wisconsin. *Id.*,¶ 86. Ultimately, however, the court found that "[t]he primary, overall legislative objective is to ensure the quality of health care for the people of Wisconsin." *Id.*, ¶¶ 87, 89.

¶ 17. With the legislative objectives noted, the supreme court ultimately concluded, based on the facts and studies in the record, "that a rational relationship does not exist between the classifications of victims in the $350,000 cap on noneconomic damages and the legislative objective of compensating victims of medical malpractice fairly." *Id.*, ¶ 105. While the court found the cap might "intuitively" appear to be related to the legislative objectives, it stated that:

> when the legislature shifts the economic burden of medical malpractice from insurance companies and negligent health care providers to a small group of vulnerable, injured patients, the legislative action does not appear rational . . . . If the legislature's objective was to ensure that Wisconsin people injured as a result of medical malpractice are compensated fairly, no rational basis exists for treating the most seriously injured patients of medical malpractice less favorably than those less seriously injured.

*Id.*, ¶¶ 101, 102 (formatting altered). The court therefore held the cap "violates the equal protection guarantees of the Wisconsin Constitution," *id.*, ¶ 187, and effectively concluded that the statute was unconstitutional on its face. *See League of Women Voters of Wisconsin Educ. Network, Inc. v. Walker*, 2014 WI 97, ¶ 15, 357 Wis. 2d 360, 851 N.W.2d 302 (A statute is unconstitutional if it "cannot be enforced under any circumstances.") (citation and quotation marks omit-

ted). However, *Ferdon* also clearly observed that it was not holding that all statutory caps on damages are *per se* unconstitutional. *Id.*, 284 Wis. 2d 573, ¶ 16.

¶ 18. In response to *Ferdon*, the legislature later amended the statutory cap on noneconomic damages to $750,000 (which we note is $50,000 more than Ferdon's award), as reflected in Wis. Stat. § 893.55. As a prelude to the new cap, the legislature explained its objectives in the introductory text of the statute:

> **(1d)** (a) The objective of the treatment of this section is to ensure affordable and accessible health care for all of the citizens of Wisconsin while providing adequate compensation to the victims of medical malpractice. Achieving this objective requires a balancing of many interests. Based upon documentary evidence, testimony received at legislative hearings, and other relevant information, the legislature finds that a limitation on the amount of noneconomic damages recoverable by a claimant or plaintiff for acts or omissions of a health care provider, together with mandatory liability coverage for health care providers and mandatory participation in the injured patients and families compensation fund by health care providers, while compensating victims of medical malpractice in appropriate circumstances by the availability of unlimited economic damages, ensures that these objectives are achieved. Establishing a limitation on noneconomic damage awards accomplishes the objective by doing all of the following:

> 1. Protecting access to health care services across the state and across medical specialties by limiting the disincentives for physicians to practice medicine in Wisconsin, such as the unavailability of professional liability insurance coverage, the high cost of insurance premiums, large fund assessments, and unpredictable or large noneconomic damage awards, as recognized by a 2003 U.S. congress joint economic committee

report, a 2003 federal department of health and human services study, and a 2004 office of the commissioner of insurance report.

2. Helping contain health care costs by limiting the incentive to practice defensive medicine, which increases the cost of patient care, as recognized by a 2002 federal department of health and human services study, a 2003 U.S. congress joint economic committee report, a 2003 federal government accounting office study, and a 2005 office of the commissioner of insurance report.

3. Helping contain health care costs by providing more predictability in noneconomic damage awards, allowing insurers to set insurance premiums that better reflect such insurers' financial risk, as recognized by a 2003 federal department of health and human services study.

4. Helping contain health care costs by providing more predictability in noneconomic damage awards in order to protect the financial integrity of the fund and allow the fund's board of governors to approve reasonable assessments for health care providers, as recognized by a 2005 legislative fiscal bureau memo, a 2001 legislative audit bureau report, and a 2005 office of commissioner of insurance report.

Sec. 893.55(1d)(a)1.- 4.

¶ 19. The legislative objectives described in the new statute substantially mirror the objectives outlined by the Wisconsin Supreme Court in *Ferdon*. The legislature stated that the main objective of the statute is to ensure affordable and quality health care for Wisconsin residents, while also ensuring that victims of medical malpractice are adequately compensated. The same objective was described in *Ferdon*. This time, the legislature concluded that a $750,000 cap on non-

581

economic damages would: limit disincentives for physicians to practice in Wisconsin; limit the incentive for doctors to practice defensive medicine; contain the cost of patient care by keeping medical malpractice premiums low; and protect the financial solvency of the Fund. There is no evidence of any consideration of the impact of this cap on the small number of severely injured Wisconsin residents.

¶ 20. The same factual analysis the supreme court applied in *Ferdon* applies here, with the dollar amount of the cap being the single distinction. *Ferdon* expressly rejected the notion that a rational relationship existed between any of these stated objectives and the amount of the $350,000 cap (adjusted for inflation). Based on the data before it, the court concluded that: (1) the existence or nonexistence of "caps on noneconomic damages [does] not affect doctors' migration," *see id.*, ¶ 168; (2) "defensive medicine cannot be measured accurately and does not contribute significantly to the cost of health care," *see id.*, ¶ 174; (3) "the correlation between caps on noneconomic damages and the reduction of medical malpractice premiums or overall health care costs is at best indirect, weak, and remote," *see id.*, ¶ 166; and (4) the cap was not necessary to the financial integrity of the Fund, *see id.*, ¶ 158 ("The Fund has flourished both with and without the cap.").

¶ 21. All of the conclusions reached by the supreme court in *Ferdon* continue to hold true today. The record before us does not support a finding that the legislative objectives articulated in Wis. Stat. § 893.55 are promoted in any way because the amount of the noneconomic damages cap is $750,000. In the years since the *Ferdon* decision, the number of physicians

participating in the Fund has *increased* every year, indicating that the cap increase has had little to no effect on physician retention in Wisconsin.[4] Indeed, data in the record before us indicates that the existence or non-existence of a noneconomic damages cap has no demonstrably consistent effect on physician retention *anywhere.* Data demonstrates that many states with no caps on noneconomic damages actually have higher physician retention rates than Wisconsin.[5] Accordingly, we conclude, as the supreme court did in *Ferdon*, that the current noneconomic damages cap is not rationally related to the legislative objective of retaining physicians in Wisconsin.

¶ 22. The legislature also cited concerns about the practice of "defensive medicine." The Wisconsin Supreme Court in *Ferdon* recognized that while anecdotal evidence supports the assertion that doctors practice defensive medicine, it is nearly impossible to accurately measure the extent to which doctors engage in this practice. *Id.*, 284 Wis. 2d 573, ¶¶ 173–174. The record before us shows that the ability to accurately measure the financial impact of "defensive medicine" practices has not improved in the years since *Ferdon*. Indeed, data suggests that the existence of noneconomic damages caps may actually increase the risk to

---

[4] We granted the parties' motion to take judicial notice of the Fund's 2014 Functional Progress Report. According to the Fund's 2014 Functional Progress Report, 13,672 physicians participated in the Fund in 2014, compared to 11,802 in 2005.

[5] According to the 2011 State Physician Workforce Data Book, Wisconsin has a 37.8% physician retention rate. Minnesota, Alabama, and Washington are among the states that do not have caps on noneconomic damages, yet their physician retention rates are higher than Wisconsin's (Minnesota: 51%; Alabama: 50.4%; Washington: 45.6%). *See* Wisconsin Physician Workforce Databook, Section 4 "Retention."

patient safety.[6] Moreover, in Wisconsin, where doctors are required to have primary medical malpractice coverage and required to contribute to the Fund, there is no risk of a doctor facing personal liability for a settlement or judgment. This lack of uninsured personal liability would logically appear to remove any incentive to practice "defensive medicine." The evidence in the record does not rationally support the conclusion that the cap reduces defensive medicine costs. Accordingly, we conclude, as the supreme court did in *Ferdon*, that the current noneconomic damages cap is not rationally related to the legislative objective of curtailing the practice of defensive medicine.

¶ 23. The legislature also cited concerns about the cost of medical malpractice premiums when it adopted the current statutory cap. The supreme court in *Ferdon* cited numerous studies indicating that medical malpractice insurance premiums are not affected by caps on noneconomic damages. *Id.*, ¶¶ 120–129. *Ferdon* noted that "[o]ne reason that the cap does not have the expected impact on medical malpractice insurance premiums may be that a very small number of claims are ever filed for medical

---

[6] *See* Bernard S. Black, Zenon Zabinski, *The Deterrent Effect of Tort Law: Evidence from Medical Malpractice Reform*, NORTHWESTERN UNIVERSITY LAW & ECONOMICS RESEARCH, Paper No. 13–09, July 2014 at 26 ("We find evidence that reduced risk of med mal litigation, due to state adoption of damage caps, leads to higher rates of preventable adverse patient safety events in hospitals. Our study . . . find[s] strong evidence consistent with classic tort law deterrence theory – in which liability for harm induces greater care and relaxing liability leads to less care. The drop in care quality occurs gradually over a number of years following adoption of damage caps."). A copy of this article was included in a supplemental appendix filed by the Mayos.

injuries, and even fewer of any eventual awards are for an amount above the cap." *Id.*, ¶ 126 (footnote omitted). The Fund admits that claims and payments have decreased in the years since *Ferdon*. In 2014, a record low number of medical malpractice lawsuits were filed in Wisconsin—eighty-four.[7] From July 1, 1975 (the inception of the Fund), through December 31, 2015, although 6036 claims were filed in which the Fund was named as a party, only 668 (11.06%) have been paid.[8] Over the course of the forty years in which the Fund has existed, to have paid only 11% of claims filed hardly suggests, much less supports, a finding of a medical malpractice crisis or even a problem.

¶ 24. Like our supreme court in *Ferdon*, the record before us does not demonstrate any correlation between medical malpractice premiums and caps on noneconomic damages. *Ferdon* noted that the Wisconsin Insurance Commissioner failed to see a link between noneconomic damages and medical malpractice premiums. *See id.*, ¶¶ 154–155. Other jurisdictions, and even many medical malpractice insurers,[9] have also failed to establish such a connection. *See Estate of*

---

[7] *See* Cary Spivak and Kevin Crowe, Wisconsin Last Among States for Malpractice Claim Payments, Analysis Shows, MILWAUKEE JOURNAL SENTINEL, July 11, 2015, http://archive.jsonline.com/watchdog/watchdogreports/wisconsin-last-among-states-for-malpractice-claim-payments-analysis-shows-b99530717z1–313906961.html.

[8] *See* WISCONSIN INSURANCE REPORT BUSINESS OF 2015: FUNDS AND PROGRAM MANAGEMENT, INJURED PATIENTS AND FAMILIES COMPENSATION FUND at 77, https://oci.wi.gov/Documents/AboutOCI/WIRBus2015.pdf.

[9] *See* Insurance Companies and Their Lobbyists Admit It: Caps on Damages Won't Lower Insurance Premiums, Public Citizen, http://www.citizen.org/congress/article_redirect.cfm?ID=9008.

*McCall v. United States*, 134 So. 3d 894, 910 (Fla. 2014) (In Florida, "[r]eports have failed to establish a direct correlation between damages caps and reduced malpractice premiums."). Accordingly, we also conclude that the evidence does not establish that the current noneconomic damages cap is rationally related to the legislative objective of keeping medical malpractice insurance premiums low.

¶ 25. Finally, the legislature cites the need to maintain the financial integrity of the Fund as a basis for imposing the current cap. As the supreme court in *Ferdon* noted, "the Fund has flourished both with and without a cap." *Id.*, 284 Wis. 2d 573, ¶ 158. As of June 2003, the Fund's cash and investment balances totaled $658.9 *million. Id.*, ¶ 137. The record demonstrates that as of 2014, the Fund has assets of approximately $1.2 *billion.* It is obvious that the Fund's financial solvency has not been negatively impacted by claims when, in fact, the Fund's assets have grown.

¶ 26. Almost immediately following *Ferdon*, the legislature proposed a $450,000 cap, a mere $5000 increase after adjusting the previous $350,000 cap for inflation. The new cap was rejected by then-Governor Jim Doyle, who noted that it "seems terribly unlikely" that the Wisconsin Supreme Court would uphold the slight increase given its holding in *Ferdon*. Ultimately, the legislature settled on $750,000. The legislative history contains neither an explanation, nor a hint, as to how that particular number was selected, much less how, in view of the Fund's balance, this cap would actually promote *any* of the stated legislative purposes. The legislative history contains neither arithmetic calculations nor statistical evidence purporting to show a link between this particular number and any

586

one of the legislature's objectives. As Justice Crooks presciently observed in his *Ferdon* concurrence:

> In Wisconsin, the history behind the legislature's setting of caps for noneconomic damages in medical malpractice actions demonstrates arbitrariness, and leads to a conclusion that a rational basis justifying the present cap was, and is, lacking. When WIS. STAT. ch. 655 was first enacted in 1975, there was no cap on noneconomic damages, but a $500,000 conditional cap that could be triggered if the Wisconsin Patient Compensation Fund's cash-flow was in jeopardy . . . . Then, in 1986, the legislature set the cap at $1,000,000. This $1,000,000 cap remained in effect until 1991, when a sunset provision became effective. There was no cap on noneconomic damages from 1991 until the legislature passed the current statutory cap of $350,000 in 1995. Thus, the caps changed from nothing, to $1,000,000, back to nothing, and finally to $350,000[.]

*Id.*, ¶ 190 (Crooks, J., concurring). The Fund holds more than one *billion* dollars according to its 2014 report. It has only paid approximately 11% of filed malpractice claims since its inception over forty years ago. As the supreme court in *Ferdon* noted, "[t]he Fund has assets" and has flourished even when there was no cap on noneconomic damages. *Id.*, ¶ 135, 158. The total number of claims the Fund has paid over the course of *forty years*,[10] does not equal the 2014 value of

[10] "From July 1, 1975, through December 31, 2015, 6,036 claims had been filed in which the Fund was named. During this period, the Fund's total number of paid claims was 668, totaling $861,555,840. Of the total number of claims in which the Fund was named, 5,228 claims were closed with no indemnity payment." *See* WISCONSIN INSURANCE REPORT BUSINESS OF 2015: FUNDS AND PROGRAM MANAGEMENT, INJURED PATIENTS AND FAMILIES COMPENSATION FUND at 77, https://oci.wi.gov/Documents/AboutOCI/WIRBus2015.pdf.

the Fund. We are left with literally no rational factual basis in the record before us which supports the legislature's determination that the $750,000 limitation on noneconomic damages is necessary or appropriate to promote any of the stated legislative objectives.

¶ 27. The preamble to WIS. STAT. § 893.55(1d)(a) lays out multiple objectives, which on examination raises the same concerns as those resolved by our supreme court in *Ferdon*. The preamble to the statute did nothing to establish a rational connection between the limit on noneconomic damages selected and the objectives the legislature cited in support of that limit. As we have seen, the cap does nothing to promote the primary purpose of the statute, which is to "ensure affordable and accessible health care for *all* of the citizens of Wisconsin *while providing adequate compensation to the victims of medical malpractice.*" *See* § 893.55(1d)(a) (emphasis added). Nor does the record contain any evidence explaining why one class of malpractice victims (the most severely injured as measured by a jury award of noneconomic damages exceeding the cap) should be denied their full jury award, while another class of malpractice victims (less severely injured as measured by a jury award of noneconomic damages *not* exceeding the cap) should receive the full jury award. By reducing damages only for the most severely injured victims of medical malpractice, that class of persons is denied equal protection guaranteed by the Wisconsin Constitution. Severely injured medical malpractice claimants are unduly burdened by the cap without a rational basis that supports the legislature's stated objectives in any way. *See* *Ferdon*, 284 Wis. 2d 573, ¶ 187.

¶ 28. Statutory caps "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation in order to satisfy State equal protection guarantees." *Id.*, ¶ 191 (Crooks, J., concurring) (citation and quotation marks omitted). Here, the $750,000 cap on noneconomic damages has the practical effect of imposing devastating costs only on the few who sustain the greatest damages and creates a class of catastrophically injured victims who are denied the adequate compensation awarded by a jury, while the less severely injured malpractice victims are awarded their full compensation.

¶ 29. Like our supreme court in *Ferdon*, we are not concluding that all caps on noneconomic damages are unconstitutional. *See id.*, ¶ 16. As in *Ferdon*, we can only conclude that the amount of this cap was arbitrarily selected because, based on the record before us, it is unrelated factually to the goals of the statute of which it is a part. Accordingly, we affirm the judgment of the circuit court and uphold the Mayos' noneconomic damages award. No costs are awarded to either party.

*By the Court*—Judgment affirmed.

¶ 30. BRASH, J. (*concurring*). The Majority's decision concludes that the $750,000 cap on noneconomic damages found in Wis. Stat. § 893.55 is unconstitutional on its face. I disagree, for reasons set forth below. However, because I agree with the trial court's conclusion that § 893.55 is unconstitutional as applied in this case—an issue the Majority decision did not reach—I concur in the result allowing the jury's award of noneconomic damages to stand.

¶ 31. The Majority's decision and analysis mirrors that of our supreme court in *Ferdon*, including the recognition of two classes of victims—those who are fully compensated from the Fund, and those who are only partially compensated. *Id.*, 284 Wis. 2d 573, ¶ 82. In *Ferdon*, the court concluded that a rational relationship did not exist between the classes of victims created by the cap and "the legislative objective of compensating victims of medical malpractice fairly." *Id.*, ¶ 105. Therefore, the court struck down the damages cap statute, which was then set at $350,000, on grounds that it violated equal protection guarantees and thus was unconstitutional on its face. *Id.*, ¶ 10.

¶ 32. In reaction to the *Ferdon* decision, the legislature went to work revising the damages cap statute in an effort to get it to pass constitutional muster. The resulting revised statute sets forth legislative objectives that track the reasoning of our supreme court in *Ferdon*. While the Majority also followed *Ferdon* as a guide, it found that the legislature came up short in terms of constitutionality. I disagree.

¶ 33. In reviewing the constitutionality of a statute on an equal protection challenge, we begin with "the principle repeatedly stated" by our supreme court, as well as the United States Supreme Court, that "all legislative acts are presumed constitutional." *Sambs v. City of Brookfield*, 97 Wis. 2d 356, 370, 293 N.W.2d 504 (1980). This presumption places a heavy burden on the party that is challenging constitutionality, because if "any doubt exists it must be resolved in favor of the constitutionality of a statute." *Id.* The court in *Sambs* further described the presumption:

> A legislative classification is presumed to be valid. The burden of proof is upon the challenging party to

establish the invalidity of a statutory classification. Any reasonable basis for the classification will validate the statute. Equal protection of the law is denied only where the legislature has made irrational or arbitrary classification . . . . The basic test is not whether some inequality results from the classification, but whether there exists any reasonable basis to justify the classification.

*Id.* at 371(citation and quotation marks omitted; ellipses in *Sambs*).

¶ 34. The test referenced by the *Sambs* court, and correctly applied by the Majority in this case, is the rational basis test. In applying the rational basis test, the court reviews whether the challenged classification "rationally relate[s] to a legitimate state interest." *Id.*

¶ 35. In his dissent in *Ferdon*, Justice Prosser focused on this concept, stating that the classifications described by the Majority would exist with any amount set forth as a statutory cap on damages. *Id.*, 284 Wis. 2d 573, ¶ 225 (Prosser, J. dissenting). Simply put, "[a]ll caps have that effect." *Id.* This assessment was echoed by Justice Roggensack in her dissent in *Ferdon*: " . . . the legislature made a rational policy choice that some victims of medical malpractice would not receive all of the noneconomic damages they were awarded, for the public good. That is a choice that any cap will have to make, no matter what the amount." *Id.*, ¶ 331 (Roggensack, J. dissenting).

¶ 36. The fact of the matter is there is a certain amount of arbitrariness in choosing any amount as a cap. However, we must review this or any constitutionally challenged statute in accordance with established standards:

> . . .it is the court's obligation to locate or to construct, if possible, a rationale that might have influenced the legislature and that reasonably upholds the legislative determination. The rationale which the court locates or constructs is not likely to be indisputable. But it is not our task to determine the wisdom of the rationale or the legislation. The legislature assays the data available and decides the course to follow.

*Sambs*, 97 Wis. 2d at 371.

¶ 37. In other words, " '[j]udicial response to a challenged legislative classification requires only that the reviewing court locate some reasonable basis for the classification made. The public policy involved is for the legislature, not the courts, to determine.' " *Id.* (citation omitted).

¶ 38. To be clear, I do not disagree that courts should—indeed, are required—to review legislative acts with a "meaningful level of scrutiny." *Ferdon*, 284 Wis. 2d 573, ¶ 77. However, I believe that the legislature has established a reasonable basis for the damages cap statute, and therefore I find it to be facially constitutional.

¶ 39. On the other hand, I would affirm the trial court's finding that the cap is unconstitutional as it applies to the Mayos. In an as-applied challenge, the party challenging the constitutionality of the statute "must show that his or her constitutional rights were actually violated." *State v. Wood*, 2010 WI 17, ¶ 13, 323 Wis. 2d 321, 780 N.W.2d 63. If the challenging party is successful in showing that such a violation occurred, the "operation of the law is void as to the party asserting the claim." *Id.*

¶ 40. This analysis differs from that of a facial challenge, however, in the presumption of constitutionality that must be extended:

> In an as-applied challenge, our task is to determine whether the statute has been enforced in an unconstitutional manner. While we presume a statute is constitutional, we do not presume that the State applies statutes in a constitutional manner. Because the legislature plays no part in enforcing our statutes, "deference to legislative acts" is not achieved by presuming that the statute has been constitutionally applied. As such, neither the challenger nor the enforcer of the statute face a presumption in an as-applied challenge. The challenger, however, has the burden of proof, a concept distinct from the presumption of constitutionality.

*Society Ins. v. LIRC*, 2010 WI 68, ¶ 27, 326 Wis. 2d 444, 786 N.W.2d 385 (quoted source, internal citation and footnote omitted).

¶ 41. Put another way:

> . . .the analysis that is employed for an as-applied challenge contains no presumption in regard to whether the statute was applied in a constitutionally sufficient manner. Rather, the analysis of an as-applied challenge is determined by the constitutional right that is alleged to have been affected by the application of the statute. Stated otherwise, the analysis differs from case to case, depending on the constitutional right at issue.

*Tammy W-G. v. Jacob T.*, 2011 WI 30, ¶ 49, 333 Wis. 2d 273, 797 N.W.2d 854.

¶ 42. In analyzing an equal protection challenge, " '[t]he fundamental determination to be made when considering a challenge based upon equal protection is

whether there is an arbitrary discrimination in the statute or its application, and thus whether there is a rational basis which justifies a difference in rights afforded.' " *State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cty.*, 122 Wis. 2d 65, 77, 362 N.W.2d 104 (1985) (citation omitted). " 'Whether there exists a rational basis involves weighing the public interest served by retroactively applying the statute against the private interest that retroactive application of the statute would affect.' " *Society Ins.*, 326 Wis. 2d 444, ¶ 30 (citation omitted).

¶ 43. I agree with the trial court that the Mayos have met their burden in challenging the caps statute on equal protection grounds. As the trial court pointed out in its written decision, the severity of Ascaris's injuries is a significant factor in this analysis. She has been left limbless and largely immobile as the result of the failure of her health care providers to provide antibiotics to combat her infection. The jury found the $16.5 million award for noneconomic damages to be reasonable, and no one has argued that it is excessive. Yet, to apply the statutory cap to this award would have the effect of reducing the award by over ninety-five percent. This highlights the disparity in applying the cap to a severely injured patient such as Ascaris, as compared to applying the cap in cases where a patient is less severely injured and receives a lower award, but is able to collect the entire amount of the award because it falls under the cap's limits.

¶ 44. Furthermore, the trial court found that denying the Mayos the full amount that the jury awarded them, especially a reduction of that extent, does nothing to further the cap's purposes. The primary goal of the legislature in enacting the cap was to regulate against excessively high or unpredictable

damages awards. This is neither. As noted above, there are no arguments that it is excessive or out of proportion with Ascaris's injuries. Moreover, the award will not threaten the viability of the Fund, as it has a current balance of over $1.08 billion, with relatively few claims paid out, and the number of claims being filed each year has been decreasing.

¶ 45. As the trial court noted, it would be unreasonable for the Mayos, whose lives have been so drastically altered due to these events, to have to "bear the brunt of the legislature's 'tort reform.' " The trial court found no rational basis for the Mayos to be denied their full jury award. I agree.

¶ 46. In sum, I would decide this case on the issue that was not addressed by the Majority—that WIS. STAT. § 893.55 is unconstitutional as applied to the Mayos. Accordingly, I would affirm the decision of the trial court, and because the Majority did not disturb the trial court's findings on that issue, I concur with the outcome of the decision.