# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2812 |
| COMPLETE TITLE: | Ascaris Mayo and Antonio Mayo, |
| |        Plaintiffs-Respondents-Cross-Appellants, |
| | United Healthcare Insurance Company and |
| | Wisconsin State Department of Health Services, |
| |        Involuntary-Plaintiffs, |
| |      v. |
| | Wisconsin Injured Patients and Families |
| | Compensation Fund, |
| |        Defendant-Appellant-Cross-Respondent-Petitioner, |
| | Proassurance Wisconsin Insurance Company, Wyatt Jaffe, MD, Donald C. Gibson, Infinity Healthcare, Inc. and Medical College of Wisconsin Affiliated Hospitals, Inc., |
| |        Defendants. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 377 Wis. 2d 566, 901 N.W.2d 782
PDC No:  2017 WI App 52 - Published

| | |
|---|---|
| OPINION FILED: | June 27, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 19, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Jeffrey A. Conen |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | R.G. BRADLEY, J., concurs, joined by KELLY, J. (opinion filed). |
|   DISSENTED: | A.W. BRADLEY, J., dissents, joined by ABRAHAMSON, J. (opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-cross-respondent-petitioner, there were briefs filed by *Kevin M. St. John*, *Roisin H. Bell*, *John N. Giftos*, and *Bell Giftos St. John LLC*, Madison. There was an oral argument by *Kevin M. St. John.*

For the plaintiffs-respondents-cross-appellants, there was a brief filed by *Susan R. Tyndall*, *Daniel A. Rottier*, *James M. Fergal*, and *Habush Habush & Rottier*, *S.C.*, Madison. There was an oral argument by *Daniel A. Rottier.*

An amicus curiae brief was filed on behalf of the Wisconsin Academy of Family Physicians, the Wisconsin Academy of Ophthalmology, Inc., the Wisconsin Chapter of the American College of Emergency Physicians, Inc., the Wisconsin Orthopaedic Society, the Wisconsin Psychiatric Association, Inc., the Wisconsin Radiological Society, Inc., the Wisconsin Society of Anesthesiologists, Inc., and the Wisconsin Society of Plastic Surgeons, Inc. by *Guy DuBeau* and *Axley Brynelson*, *LLP*, Madison.

An amicus curiae brief was filed on behalf of the State of Wisconsin by *Misha Tseytlin*, solicitor general, *Brad D. Schimel*, attorney general, and *Amy C. Miller*, assistant solicitor general. There was an oral argument by *Misha Tseytlin*, solicitor general.

An amicus curiae brief was filed on behalf of Wisconsin Hospital Association by *Sara J. MacCarthy*, *Timothy W. Feeley*, and *Hall*, *Render*, *Killian*, *Heath & Lyman*, *P.C.*, Milwaukee.

An amicus curiae brief was filed on behalf of Wisconsin Medical Society and American Medical Association Litigation Center by *Anne Berleman Kearney* and *Appellate Consulting Group*, Milwaukee.

An amicus curiae brief was filed on behalf of The Physician Insurers Association of America by *Samuel J. Leib*, *Brent A. Simerson*, *Brenden M. Leib*, and *Leib Knott Gaynor LLC*, Milwaukee.

2

An amicus curiae brief was filed on behalf of Wisconsin Manufacturers and Commerce by *Lucas T. Vebber*, *Corydon J. Fish*, and *Wisconsin Manufacturers and Commerce*, Madison.

An amicus curiae brief was filed on behalf of the Wisconsin Association for Justice by *William C. Gleisner*, *III* and *Law Offices of William Gleisner*, Brookfield, with whom on the brief were *J. Michael End* and *End*, *Hierseman & Crain*, *LLC*, Milwaukee.

An amicus curiae brief was filed on behalf of Wisconsin Defense Counsel by *Justin F. Wallace* and *Nash*, *Spindler*, *Grimstad*, *& McCracken*, *LLP*, Manitowoc, with whom on the brief were *Monte E. Weiss*, *Charles W. Kramer*, and *Weiss Law Office SC*, Mequon.

An amicus curiae brief was filed on behalf of the American Tort Reform Association, the Wisconsin Civil Justice Council, the National Federation of Independent Business, the Chamber of Commerce of the United States, and the Wisconsin Insurance Alliance by *James A. Friedman*, *Bryan J. Cahill*, and *Godfrey & Kahn*, *S.C.*, Madison.

No.  2014AP2812
(L.C. No.  2012CV6272)

STATE OF WISCONSIN       :      IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification.  The final version will appear in the bound volume of the official reports.**

Ascaris Mayo and Antonio Mayo,

      **Plaintiffs-Respondents-Cross-Appellants,**

United Healthcare Insurance Company and
Wisconsin State Department of Health Services,

      **Involuntary-Plaintiffs,**

   **v.**

Wisconsin Injured Patients and Families
Compensation Fund,

      **Defendant-Appellant-Cross-Respondent-Petitioner,**

Proassurance Wisconsin Insurance Company,
Wyatt Jaffe, MD, Donald C. Gibson, Infinity
Healthcare, Inc. and Medical College of
Wisconsin Affiliated Hospitals, Inc.,

      **Defendants.**

**FILED**

**JUN 27, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Reversed and cause remanded.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. Our review considers whether the legislatively-enacted cap of $750,000 (the cap) on noneconomic damages for victims of medical malpractice that is set out in Wis. Stat. § 893.55 (2015-16)[1] is unconstitutional facially or as applied, based on equal protection and due process grounds. In reliance on <u>Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund</u>, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440, the court of appeals concluded that the cap was facially unconstitutional.[2] The court of appeals did not address whether § 893.55 was unconstitutional as applied to Ascaris and Antonio Mayo (the Mayos). However, the circuit court had concluded that the $750,000 cap on noneconomic damages was unconstitutional as applied to the Mayos.[3]

¶2 We conclude that rational basis is the proper standard by which to judge the constitutionality of Wis. Stat. § 893.55; that § 893.55 is facially constitutional and constitutional as applied to the Mayos; and that <u>Ferdon</u> erroneously invaded the province of the legislature and applied an erroneous standard of review. Accordingly, we reverse the court of appeals' decision, overrule <u>Ferdon</u>, and conclude that the $750,000 cap on

---

[1] All references to Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

[2] <u>Mayo v. Wis. Injured Patients and Families Comp. Fund</u>, 2017 WI App 52, ¶1, 377 Wis. 2d 566, 901 N.W.2d 782.

[3] The Honorable Jeffrey A. Conen of Milwaukee County presided.

noneconomic damages in medical malpractice judgments and settlements is constitutional both facially and as applied to the Mayos.

¶3 Therefore, we reverse the court of appeals and remand to the circuit court to impose the $750,000 cap on noneconomic damages.

## I.  BACKGROUND

### A.  The Guaranteed Payment System

¶4 In 1975, as a result of what was deemed to be a "medical malpractice crisis," the legislature established a comprehensive system of guaranteed payments and controlled liability.  The Wisconsin Injured Patients and Families Compensation Fund (the Fund) was created at that time as part of the legislature's comprehensive system.  Wis. Patients Comp. Fund v. Wis. Health Care Liab. Ins. Plan, 200 Wis. 2d 599, 607, 547 N.W.2d 578 (1996) (hereinafter WHCLIP).  In addition to guaranteeing payment and controlling liability, the legislature established required procedures for processing and paying claims that alleged medical malpractice.  § 1, ch. 37, Laws of 1975.

¶5 Chapter 655 "provide[s] the exclusive procedure for a person to pursue a malpractice claim against a health care provider."  Rouse v. Theda Clark Med. Ctr., Inc., 2007 WI 87, ¶35, 302 Wis. 2d 358, 735 N.W.2d 30.  Under Wisconsin's comprehensive system, each health care provider must maintain liability coverage of at least $1 million per claim and

3

$3 million for all claims in a given policy year, Wis. Stat. § 655.23(4)(b)2, or qualify as a self-insurer, § 655.23(3)(a).[4] In addition to maintaining liability insurance, health care providers are required to participate in the Fund by paying annual assessments.  Wis. Stat. § 655.27(3)(a).

¶6   The combination of required insurance and required assessments by the Fund, which health care providers must pay, creates a mechanism for guaranteed payment to those who are injured by medical malpractice.  This is so because the Fund pays medical malpractice claims in excess of the health care provider's insurance coverage amount.  Wis. Stat. § 655.27(1). "In other words, the Fund is liable for payments 'after a health care provider's statutorily mandated liability coverage limits are exceeded.'"  Wis. Med. Soc'y v. Morgan, 2010 WI 94, ¶12, 328 Wis. 2d 469, 787 N.W.2d 22 (quoting WHCLIP, 200 Wis. 2d at 613).[5]

¶7   In regard to those injured by medical malpractice, the Fund guarantees payment of 100 percent of all settlements and judgments for economic damages arising from medical malpractice. However, payments by the Fund for noneconomic damages are

---

[4] Health care providers employed by the state, county, municipality and federal government are, however, exempt from the requirements of Chapter 655.  See Wis. Stat. § 655.003(1).

[5] The Fund also covers claims made against any provider's employee who is acting within the scope of his or her employment in providing health care services, ensuring that any person seeking care from a covered provider is protected under the Fund.  Wis. Stat. § 655.005(2).

4

limited to $750,000 for each claim.[6] Wis. Stat. § 893.55(4)(d)1. So long as health care providers maintain the required insurance and annually contribute to the Fund, they are not personally liable for damages arising from medical malpractice. Wis. Stat. § 655.23(5).[7]

¶8    From the time the Fund was created, July 1, 1975, until March of 2005,[8] the Fund paid approximately $586,300,000 in claims. Morgan, 328 Wis. 2d 469, ¶21. By December 31, 2007, the total claim payments had increased to $666,100,000. Id. Through December 31, 2017, the fund has paid approximately $866,100,000 in claims. 2017 Functional and Progress Report, Wis. Office of the Comm'r of Ins. (Feb. 23, 2018), https://oci.wi.gov/Documents/Funds/IPFCF2017FunctionalandProgressReport.pdf. The number of Fund claims begun in any given year fluctuates. In 2013-14, there were 83 pending potential claims

---

[6] "Noneconomic damages" are defined as "moneys intended to compensate for pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; loss of consortium, society and companionship; or loss of love and affection." Wis. Stat. § 893.55(4)(a).

[7] The statute directs that a provider is liable for "no more than the limits expressed in sub. (4) or the maximum liability limit for which the health care provider is insured, whichever is higher." Wis. Stat. § 655.23(5).

[8] Our decision in Ferdon which eliminated the previous noneconomic damages cap was issued on July 14, 2005. Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440.

against the Fund, followed just two years later in 2015-16 with 40 potential claims, and the most recent report for 2016-17 shows 55 potential claims against the Fund. Id.

¶9 When the Fund was created in 1975, there was no cap on noneconomic damages. It was not until 1986 that the legislature capped noneconomic damages. The 1986 cap was $1 million. 1985 Wis. Act 340, §§ 30, 72. The initial cap expired on January 1, 1991. Id.

¶10 After the expiration of the 1986 cap on noneconomic damages, the cost of insurance for health care providers rose, as did health care costs. See Maurin v. Hall, 2004 WI 100, ¶65 n.7, 274 Wis. 2d 28, 682 N.W.2d 866, overruled on other grounds by Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, 293 Wis. 2d 38, 717 N.W.2d 216. In response, the legislature again enacted a cap on noneconomic damages, this time setting the limit at $350,000. 1995 Wis. Act 10, §§ 5, 9.

¶11 The $350,000 cap remained in place until we concluded that it was unconstitutional in Ferdon.[9] Following Ferdon, the legislature acted to impose the $750,000 cap on noneconomic damages that is before us. 2005 Wis. Act 183, §§ 1, 7. For all other damages, payment is guaranteed to the injured party for 100 percent of a judgment or settlement.

---

[9] While the original amount of the cap was $350,000, the limit was indexed to inflation so that at the time of the Ferdon decision, the cap was $445,755. Ferdon, 284 Wis. 2d 573, ¶200 (Prosser, J., dissenting).

6

¶12 In creating the $750,000 cap for noneconomic damages, the legislature undertook substantial investigative efforts to assure that any future legislation in regard to a cap would be constitutionally appropriate. The assembly established a "Medical Malpractice Task Force" with the aim of implementing revisions to the law in response to the court's Ferdon decision. The task force found that noneconomic damages are an aspect of recovery that often is based on emotion and not on any predictable standard. The task force said that "[a] reasonable cap on noneconomic damages serves as a rational balance [in] the Legislature's plan to ensure that successful malpractice plaintiffs are able to recover appropriate damages." Further, "[m]edical liability reform is part of a broad legislative strategy designed to keep health care affordable and available in Wisconsin." "[C]apping noneconomic damages for unquantifiable harms while continuing to allow unlimited recovery for economic damages is crucial to this strategy."

¶13 Sixty-two members of a bipartisan committee of the legislature submitted new legislation that would increase the cap to $750,000. See 2005 AB 1073, §§ 1, 7. Hearings then were held, and testimony was provided both for and against the $750,000 cap.

¶14 The legislature carefully set out its objectives, stating that "[t]he objective of the treatment of this section is to ensure affordable and accessible health care for all of the citizens of Wisconsin while providing adequate compensation to the victims of medical malpractice." 2005 Wis. Act 183, § 3.

7

Further, the legislature codified its reasoning by which "[e]stablishing a limitation on noneconomic damage awards accomplishes the objective:"

1. Protecting access to health care services across the state and across medical specialties by limiting the disincentives for physicians to practice medicine in Wisconsin, such as the unavailability of professional liability insurance coverage, the high cost of insurance premiums, large fund assessments, and unpredictable or large noneconomic damage awards, as recognized by a 2003 U.S. congress joint economic committee report, a 2003 federal department of health and human services study, and a 2004 office of the commissioner of insurance report.

2. Helping contain health care costs by limiting the incentive to practice defensive medicine, which increases the cost of patient care, as recognized by a 2002 federal department of health and human services study, a 2003 U.S. congress joint economic committee report, a 2003 federal government accounting office study, and a 2005 office of the commissioner of insurance report.

3. Helping contain health care costs by providing more predictability in noneconomic damage awards, allowing insurers to set insurance premiums that better reflect such insurers' financial risk, as recognized by a 2003 federal department of health and human services study.

4. Helping contain health care costs by providing more predictability in noneconomic damage awards in order to protect the financial integrity of the fund and allow the fund's board of governors to approve reasonable assessments for health care providers, as recognized by a 2005 legislative fiscal bureau memo, a 2001 legislative audit bureau report, and a 2005 office of commissioner of insurance report.

Wis. Stat. § 893.55(1)(d).

¶15 Act 183 also said that "the limitation of $750,000 represents an appropriate balance between providing reasonable

8

compensation for noneconomic damages associated with medical malpractice and ensuring affordable and accessible health care," and that "[t]his finding is based on actuarial studies provided to the legislature, the experiences of other states with and without limitations on noneconomic damages associated with medical malpractice, the testimony of experts, and other documentary evidence presented to the legislature." 2005 Wis. Act 183, § 3. Finally, the legislature noted that "the number chosen is neither too high nor too low to accomplish the goals of affordable and accessible health care, is a reasonable and rational[] response to the current medical liability situation, and is reasonably and rationally supported by the legislative record." Id.

¶16 The $750,000 cap remained in effect until the court of appeals held it unconstitutional in this action.

### B. The Mayos

¶17 This action arose after Ascaris Mayo made two trips to two emergency rooms in May 2011. On the first occasion, she visited the emergency room at Columbia St. Mary's Hospital in Milwaukee after experiencing abdominal pain and a high fever. She was seen by a physician and a physician's assistant and was advised to follow up with her gynecologist because she had a history of uterine fibroids. The next day, Ascaris Mayo went to a different emergency room where she was diagnosed with sepsis that was caused by an untreated infection. As the result of sepsis, many of her organs failed and all four of her limbs developed dry gangrene, necessitating amputation.

9

¶18 In June of 2012, the Mayos sued in Milwaukee County Circuit Court alleging medical malpractice and failure to provide proper information. Their claims were tried to a jury. Neither the physician nor the physician's assistant who saw Ascaris Mayo at Columbia St. Mary's emergency room was found to have been negligent. The jury did find, however, that neither provider gave Ascaris Mayo adequate information regarding alternate diagnoses and options for treatment of the alternate diagnoses. In addition to economic damages totaling $8,842,096,[10] the jury awarded noneconomic damages of $15,000,000 to Ascaris Mayo[11] and $1,500,000 to her husband.[12]

¶19 After the verdict was issued, the Fund moved to reduce the jury's noneconomic damage award to $750,000 as required by the cap. The Mayos also made motions after verdict, moving for entry of judgment on the verdict, as well as for declaratory

---

[10] This sum included $1,142,096 for past health care services; $7,100,000 for future health care services; $100,000 for past loss of earning capacity; and $500,000 for future loss of earning capacity.

[11] These damages were for "pain, suffering, disability, and disfigurement."

[12] The compensation for Mayo's husband was for "the loss of society and companionship of his wife."

10

judgment that Wis. Stat. §§ 655.017 and 893.55(4) are unconstitutional facially and as applied to the Mayos.[13]

¶20 The circuit court held that the cap was not facially unconstitutional, but concluded that it was unconstitutional as applied to the Mayos on equal protection and due process grounds. In reaching its conclusion, the circuit court relied on the court's decision in Ferdon.

¶21 The court of appeals, in a published opinion, affirmed the jury's noneconomic damage award, but on a different basis. The court of appeals "conclude[d] that the statutory cap on noneconomic damages is unconstitutional on its face because it violates the same principles our supreme court articulated in [Ferdon], by imposing an unfair and illogical burden only on catastrophically injured patients, thus denying them the equal protection of the laws." Mayo v. Wis. Injured Patients and Families Comp. Fund, 2017 WI App 52, ¶1, 377 Wis. 2d 566, 901 N.W.2d 782. For the reasons stated below, we reverse the court of appeals decision, and conclude that the $750,000 cap on noneconomic damages in medical malpractice judgments and settlements is constitutional both facially and as applied to the Mayos.

---

[13] As basis for their claims of unconstitutionality, the Mayos said that the statutes "violate [their] right to a jury trial, their right to a certain remedy, the separation of powers doctrine, and the due process and equal protection clauses of the Wisconsin Constitution."

## II.   DISCUSSION

¶22 The Mayos challenge the facial constitutionality of the cap and as the cap is applied to them.  They claim that the classification for those who suffer noneconomic damages in excess of the cap violates their right to due process and equal protection.  The Mayos also argue that the cap is unconstitutional as applied to them because of the dramatic decrease to their noneconomic damages award.  The Fund, however, contends that under a rational basis review, the $750,000 cap survives constitutional scrutiny.

### A.   Standard of Review

¶23 A facial challenge to the constitutionality of a statute presents a question of law that we review independently, while benefitting from the court of appeals' and the circuit court's discussions.  Milwaukee Branch of NAACP v. Walker, 2014 WI 98, ¶21, 357 Wis. 2d 469, 851 N.W.2d 262.  An as-applied constitutional challenge also is subject to our independent review.  Society Ins. v. LIRC, 2010 WI 68, ¶13, 326 Wis. 2d 444, 786 N.W.2d 385.  Although we uphold historical factual findings of the circuit court unless they are clearly erroneous, id., there is no contest about the relevant facts in the case before us.

### B.   General Principles of Constitutional Review

¶24 There are two general types of constitutional challenges to statutes:  facial and as-applied.  League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶13,

357 Wis. 2d 360, 851 N.W.2d 302. We previously have explained that:

> A party may challenge a law . . . as being unconstitutional on its face. Under such a challenge, the challenger must show that the law cannot be enforced "under any circumstances." . . . In contrast, in an as-applied challenge, we assess the merits of the challenge by considering the facts of the particular case in front of us, "not hypothetical facts in other situations." Under such a challenge, the challenger must show that his or her constitutional rights were actually violated.

Id. (quoting State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63).

¶25 In either type of constitutional challenge, we presume that the statute is constitutional. League of Women Voters, 357 Wis. 2d 360, ¶16; State v. McKellips, 2016 WI 51, ¶29, 369 Wis. 2d 437, 881 N.W.2d 258; Madison Metro. Sewerage Dist. v. Stein, 47 Wis. 2d 349, 357, 177 N.W.2d 131 (1970); Town of Beloit v. City of Beloit, 37 Wis. 2d 637, 643, 155 N.W.2d 633 (1968).

¶26 Our presumption of constitutionality is based on respect for a co-equal branch of government and its legislative acts. Dane Cty. Dep't of Human Servs. v. Ponn P., 2005 WI 32, ¶16, 279 Wis. 2d 169, 694 N.W.2d 344. If any doubt persists about whether a statute is constitutional, we resolve doubt in favor of concluding that the statute is constitutional. McKellips, 369 Wis. 2d 437, ¶29; Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶18, 237 Wis. 2d 99, 613 N.W.2d 849. In our analysis, we do not reweigh the policy choices of the legislature.

¶27 A party challenging the constitutionality of a statute bears a very heavy burden in overcoming the presumption of constitutionality. League of Women Voters, 357 Wis. 2d 360, ¶17. In order to be successful, the challenger must prove that the statute is unconstitutional "beyond a reasonable doubt." Id. In the context of a challenge to a statute's constitutionality, "beyond a reasonable doubt" "expresses the 'force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute . . . can be set aside.'" Id. (quoting Ponn P., 279 Wis. 2d 169, ¶18).

¶28 Generally, Wisconsin courts have employed two levels of scrutiny when addressing equal protection challenges. Thorp v. Town of Lebanon, 2000 WI 60, ¶38, 235 Wis. 2d 610, 612 N.W.2d 59. Strict scrutiny is applied to statutes that restrict a fundamental right. League of Women Voters, 357 Wis. 2d 360, ¶¶139-40 (concluding that the right to vote is fundamental). Strict scrutiny is also applied to the regulation of protected classes. Thorp, 235 Wis. 2d 610, ¶38. When strict scrutiny is applied, the statute must serve a compelling state interest; the statute must be necessary to serving that interest; and the statute must be narrowly tailored toward furthering that compelling state interest. Id. There has been no contention that the Mayos have a fundamental right to payment of all damages awarded by the jury nor that the $750,000 cap on noneconomic damages discriminates against a suspect class. Therefore, strict scrutiny does not apply. Bostco LLC v. Milw.

14

Metro. Sewerage Dist., 2013 WI 78, ¶76, 350 Wis. 2d 554, 835 N.W.2d 160.

¶29 The more common level of statutory scrutiny is rational basis scrutiny, where statutes are upheld if there is any rational basis for the legislation. Id. "The basic test is not whether some inequality results from the classification, but whether there exists any reasonable basis to justify the classification." Id. (citing Sambs v. City of Brookfield, 97 Wis. 2d 356, 293 N.W.2d 504 (1980)). In an as-applied challenge to the damages limited by Wis. Stat. § 893.80(3), we concluded that not all disparities are sufficient to sustain the contention of unconstitutionally disparate treatment. Bostco LLC, 350 Wis. 2d 554, ¶79.

¶30 In Ferdon, the majority opinion spent many paragraphs discussing rational basis and concluding that strict scrutiny was not appropriate in assessing the then $350,000 cap on noneconomic damages. Ferdon, 284 Wis. 2d 573, ¶¶59-96. Its discussion recited the usual rules applicable to a rational basis review. However, after its thorough discussion, the court threw all of the principles of rational basis aside. It created an intermediate level of review that it called "rational basis with teeth, or meaningful rational basis." Id.

¶31 The court gave this new level of scrutiny no standards by which to determine whether it should be applied; but instead, overturned the then existing cap on noneconomic damages through application of the majority's policy choice for Wisconsin. For example, the court opined that "[a] cap on noneconomic damages

15

diminishes tort liability for health care providers and diminishes the deterrent effect of tort law." Id., ¶89. In concluding that the legislature's policy choice was constitutionally flawed, the majority opinion said, "[t]he legislature enjoys wide latitude in economic regulation. But when the legislature shifts the economic burden of medical malpractice from insurance companies and negligent health care providers to a small group of vulnerable, injured patients, the legislative action does not appear rational." Id., ¶101. The majority did not consider that part of the legislative plan that guaranteed 100 percent payment of all other damages, a benefit that no other tort carries. Accordingly, the test for rational basis with teeth is whether the petitioner's claim is in line with the Ferdon majority's policy choice for Wisconsin.

¶32 We hereby overrule Ferdon. Rational basis with teeth has no standards for application, usurps the policy forming role of the legislature and creates uncertainty under the law. Ferdon also creates new doctrine when it holds that "[a] statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies. A past crisis does not forever render a law valid." Id., ¶114. There is no law to support this extraordinary declaration and we overrule it as well as "rational basis with teeth."

C. Facial Challenge

¶33 When a party challenges a law as being unconstitutional on its face, he or she must show that the law

16

cannot be enforced "under any circumstances." Wood, 323 Wis. 2d 321, ¶13. A challenger must meet the highest level of proof, beyond a reasonable doubt, if he or she is to succeed. League of Women Voters, 357 Wis. 2d 360, ¶17.

¶34 The Mayos argue that the cap on noneconomic damages in the context of medical malpractice "attempt[s] to resolve a perceived societal problem on the backs of the few, most severely injured, victims of medical malpractice." Because of this alleged disparate treatment under the cap, the Mayos say that their rights to equal protection and due process have been violated.

¶35 Article I, Section 1 of the Wisconsin Constitution provides that:

> All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

Article I, Section 1 has been interpreted as providing the same equal protection and due process rights afforded by the Fourteenth Amendment to the United States Constitution.[14] State

---

[14] The text of the Fourteenth Amendment states, in relevant part:

> nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend XIV, § 1.

17

ex rel. Sonneborn v. Sylvester, 26 Wis. 2d 43, 49, 132 N.W.2d 249 (1965).

¶36  When a party makes a facial challenge, he or she bears a heavy burden because "legislative enactments are presumed constitutional, and we will resolve any reasonable doubt in favor of upholding the provision as constitutional." Bostco LLC, 350 Wis. 2d 554, ¶76. This presumption is grounded in our understanding and respect for the differing roles of the legislature and the judiciary. Vincent v. Voight, 2000 WI 93, ¶52 n.22, 236 Wis. 2d 588, 614 N.W.2d 388. "In the context of an equal protection challenge, we will sustain a legislative enactment that creates a distinction between treatment of different groups, if there exists a rational basis to support that distinction, provided that the distinction does not implicate a suspect class or impinge upon a fundamental right." Bostco LLC, 350 Wis. 2d 554, ¶76. Because, as we have said previously, the cap does not deny any fundamental right or implicate any suspect class, we apply rational basis review. State v. Smith, 2010 WI 16, ¶12, 323 Wis. 2d 377, 780 N.W.2d 90.

¶37 In bringing an equal protection challenge, the challenging party must show that the statute "treats members of similarly situated classes differently." Tomczak v. Bailey, 218 Wis. 2d 245, 261, 578 N.W.2d 166 (1998). In their facial challenge, the Mayos allege that the cap creates two classes: medical malpractice claimants who are fully compensated for noneconomic damages (noneconomic damages of $750,000 or less), and those who are not fully compensated (noneconomic damages

18

greater than $750,000). Because the parties agree to employ this classification for purposes of the facial, equal protection challenge, we accept it too.

¶38 With regard to due process, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974). Due process "bars certain arbitrary, wrongful government actions." State v. Radke, 2003 WI 7, ¶12, 259 Wis. 2d 13, 657 N.W.2d 66.

¶39 While equal protection and due process challenges may have different implications, "[t]he analysis under both the due process and equal protection clauses is largely the same." State v. Quintana, 2008 WI 33, ¶78, 308 Wis. 2d 615, 748 N.W.2d 447. Therefore, as a practical matter, the rational basis analysis for the Mayos' facial, equal protection challenge will be relevant to their due process claim as well. See Smith, 323 Wis. 2d 377, ¶16.

¶40 Having determined that we apply rational basis review, we must now determine whether the legislature had a rational basis for enacting the cap. In our rational basis review, we consider not "whether some inequality results from the classification, but whether there exists any reasonable basis to justify the classification." Bostco LLC, 350 Wis. 2d 554, ¶76 (quoting Sambs, 97 Wis. 2d at 371). When, as in the case before us, there is no fundamental right or suspect class implicated by the legislative enactment, the statute "must be sustained unless it is 'patently arbitrary' and bears no rational relationship to

19

a legitimate government interest." Smith, 323 Wis. 2d 377, ¶12 (quoting Frontiero v. Richardson, 411 U.S. 677, 683 (1973)). We will not reweigh the policy choices of the legislature, State ex rel. Strykowski v. Wilkie, 81 Wis. 2d 491, 506, 261 N.W.2d 434 (1978), because "[r]ational basis review does not 'allow us to substitute our personal notions of good public policy for those of' the legislature," Blake v. Jossart, 2016 WI 57, ¶32 n.16, 370 Wis. 2d 1, 884 N.W.2d 484, cert. denied, 137 S. Ct. 669 (2017) (quoting Schweiker v. Wilson, 450 U.S. 221, 234 (1981)).

¶41 A statute is unconstitutional under rational basis scrutiny if the legislature "applied an irrational or arbitrary classification when it enacted the provision." Aicher, 237 Wis. 2d 99, ¶57. "It is not our role to determine the wisdom or rationale underpinning a particular legislative pronouncement." Id.; see also FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). While we recognize that legislative enactments can be imperfect and result in inequities, "our goal is to determine whether a classification [] rationally advances a legislative objective." Aicher, 237 Wis. 2d 99, ¶57.

¶42 A classification created by legislative enactment will survive rational basis scrutiny upon meeting five criteria:

> (1) All classification[s] must be based upon substantial distinctions which make one class really different from another.
>
> (2) The classification adopted must be germane to the purpose of the law.

20

(3) The classification must not be based upon existing circumstances only. [It must not be so constituted as to preclude addition to the numbers included within a class.]

(4) To whatever class a law may apply, it must apply equally to each member thereof.

(5) That the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

Id., ¶58 (quoting Dane Cty. v. McManus, 55 Wis. 2d 413, 423, 198 N.W.2d 667 (1972)).

¶43 When we apply five-step rational basis scrutiny, as we explain further below, we conclude that the legislature's comprehensive plan that guarantees payment while controlling liability for medical malpractice through the use of insurance, contributions to the Fund and a cap on noneconomic damages has a rational basis. Therefore, it is not facially unconstitutional.

¶44 First, we determine whether the classification of those who have greater than $750,000 in noneconomic damages is substantially different from the class of injured patients who have less than $750,000 of noneconomic damages. Aicher, 237 Wis. 2d 99, ¶58. This distinction is obviously "real" as a person who fits into the former category cannot also be part of the latter. The first step of rational basis scrutiny is satisfied.

¶45 Second, Chapter 655 of the Wisconsin Statutes creates a comprehensive plan for claims of medical malpractice in Wisconsin. Included in this plan is the right to guaranteed

21

payment of unlimited damages for economic losses, as well as past and future health care costs. Wis. Stat. § 655.23; Wis. Stat. § 655.27. Payment of noneconomic damages up to, and including, $750,000 also is guaranteed. Wis. Stat. § 655.017; Wis. Stat. § 893.55(1d)(b).

¶46 When the legislature enacted Chapter 655 in 1975, it also made a number of legislative findings. We will not relate them here because the legislature took a fresh look at medical malpractice damages in amending Chapter 655 after this court's decision in Ferdon. In so doing, the legislature placed its policy rationale within the statutes so that it would be clearly understood.

¶47 The legislature stated that the fund was "established to curb the rising costs of health care by financing part of the liability incurred by health care providers as a result of medical malpractice claims and to ensure that proper claims are satisfied." Wis. Stat. § 655.27(6). Additionally, with regard to the cap itself, the legislature explicitly laid out its objectives and support for the cap:

> The objective of the treatment of this section is to ensure affordable and accessible health care for all of the citizens of Wisconsin while providing adequate compensation to the victims of medical malpractice. Achieving this objective requires a balancing of many interests. Based upon documentary evidence, testimony received at legislative hearings, and other relevant information, the legislature finds that a limitation on the amount of noneconomic damages recoverable by a claimant or plaintiff for acts or omissions of a health care provider, together with mandatory liability coverage for health care providers and mandatory participation in the injured patients and

22

families compensation fund by health care providers, while compensating victims of medical malpractice in appropriate circumstances by the availability of unlimited economic damages, ensures that these objectives are achieved. Establishing a limitation on noneconomic damage awards accomplishes the objective by doing all of the following:

1. Protecting access to health care services across the state and across medical specialties by limiting the disincentives for physicians to practice medicine in Wisconsin, such as the unavailability of professional liability insurance coverage, the high cost of insurance premiums, large fund assessments, and unpredictable or large noneconomic damage awards, as recognized by a 2003 U.S. congress joint economic committee report, a 2003 federal department of health and human services study, and a 2004 office of the commissioner of insurance report.

2. Helping contain health care costs by limiting the incentive to practice defensive medicine, which increases the cost of patient care, as recognized by a 2002 federal department of health and human services study, a 2003 U.S. congress joint economic committee report, a 2003 federal government accounting office study, and a 2005 office of the commissioner of insurance report.

3. Helping contain health care costs by providing more predictability in noneconomic damage awards, allowing insurers to set insurance premiums that better reflect such insurers' financial risk, as recognized by a 2003 federal department of health and human services study.

4. Helping contain health care costs by providing more predictability in noneconomic damage awards in order to protect the financial integrity of the fund and allow the fund's board of governors to approve reasonable assessments for health care providers, as recognized by a 2005 legislative fiscal bureau memo, a 2001 legislative audit bureau report, and a 2005 office of commissioner of insurance report.

Wis. Stat. § 893.55(1d)(a). The legislature also stated further reasoning for the choice of $750,000 as a cap on noneconomic damages when it explained:

> Based on actuarial studies, documentary evidence, testimony, and the experiences of other states, the legislature concludes there is a dollar figure so low as to deprive the injured victim of reasonable noneconomic damages, and there is a dollar figure at which the cap number is so high that it fails to accomplish the goals of affordable and accessible health care. The legislature concludes that the number chosen is neither too high nor too low to accomplish the goals of affordable and accessible health care, is a reasonable and rational response to the current medical liability situation, and is reasonably and rationally supported by the legislative record.

§ 893.55(1d)(c).

¶48 The cap on noneconomic damages was driven by a number of legislative goals that were advanced by the classification: (a) lowering health care costs and insurance rates, (b) incentivizing physicians to practice in Wisconsin, (c) limiting the amount of defensive medicine practiced thereby reducing costs to patients, (d) making noneconomic damage payments to claimants more predictable thereby controlling premium adjustments to health care providers and (e) protecting the integrity of the Fund. Under a rational basis review, we do not consider whether the legislature achieved its goals. Rather, we recognize that the legislature had ample testimony before it to support its policy choices, and we will not reweigh legislative choices. See Wilkie, 81 Wis. 2d at 506.

24

¶49 By enacting the cap, the legislature made a legitimate policy choice, knowing that there could be some harsh results for those who suffered medical malpractice and would not be able to recover the full amount of their noneconomic damages. However, any cap, by its very nature, will limit the amount that some people will be able to recover. If the cap did not do so, it would have no economic effect.

¶50 It must also be noted, however, that while there is a cap on noneconomic damages, there also is a guarantee of payment for all other categories of damages that a victim of medical malpractice may be awarded. No other tort has a guarantee of unlimited payment for a jury's award of economic damages.

¶51 Because the classification created by the cap supports the purpose of the law and the legislature's overarching goal of "ensur[ing] affordable and accessible health care for all of the citizens of Wisconsin while providing adequate compensation to the victims of medical malpractice, Wis. Stat. § 893.55(1d)(a), we continue to the third step of our rational basis review.

¶52 The legislative classification must not be based solely upon existing circumstances. Aicher, 237 Wis. 2d 99, ¶58. Here, the law does nothing to "preclude addition to the numbers included within a class," and "allow[s] expansion of the class" to include additional members in the future. Id., ¶69. Therefore, the third factor is satisfied.

¶53 Fourth, we consider whether the cap applies equally to the members of each class created. Id., ¶58. The Mayos argue that the cap does not apply equally to all members of the class

25

whose noneconomic damages exceed $750,000 because the greater the award given, the smaller the percentage of that award that is recovered. However, contrary to the Mayos' argument, the cap on noneconomic damages remains at $750,000 regardless of whether an individual is awarded $750,000 or $15 million. Therefore each person for whom the cap is a factor in recovery is treated exactly the same. Their noneconomic damages will be capped at $750,000. Because each member of the class is treated precisely the same under the cap, the fourth Aicher factor is met.

¶54 Fifth, and finally, we must determine whether the characteristics of each class are so different from those of the other class to "reasonably suggest" legislation that is for the public good. Id., ¶58. The legislature was concerned with massive noneconomic damage awards because they are unpredictable and often based on emotion. The legislature wanted to plan for accessible health care while providing reasonable compensation for those who are injured. The legislature chose to provide a mechanism to pay 100 percent of all damages arising from medical malpractice except for noneconomic damages, on which it placed a $750,000 cap. The legislature made a rational policy choice by

limiting noneconomic damages; therefore, we conclude that the fifth part of the Aicher rational basis review is satisfied.[15]

¶55 The party who challenges the constitutionality of a statute bears a very heavy burden in overcoming the presumption of constitutionality. The challenging party must prove that the statute is unconstitutional "beyond a reasonable doubt." League of Women Voters, 357 Wis. 2d 360, ¶17. All steps of the Aicher rational basis test have been fully satisfied; accordingly, we conclude that the Mayos have failed to show the cap on noneconomic damages is unconstitutional beyond a reasonable doubt. As a result, their facial challenge fails. However, because the Mayos also challenge the constitutionality of the cap on noneconomic damages as applied to them, our discussion continues.

## D. As-applied Challenge

¶56 As-applied challenges question the constitutionality of a statute "on the facts of a particular case or [as applied] to a particular party." Smith, 323 Wis. 2d 377, ¶10 n.9. (quoting Challenge, Black's Law Dictionary 223 (7th Ed. 1999)). "In an as-applied challenge, the constitutionality of the statute itself is not attacked; accordingly, the presumption

---

[15] The legislature has made similar policy choices that have limited damages for medical malpractice in other circumstances. For example, if the healthcare providers who interacted with Ascaris Mayo had been employees of a state hospital, the Mayos' damages for economic and noneconomic damages would have been limited to a total of $250,000. Wis. Stat. § 655.003(1); Wis. Stat. § 893.82(6).

27

that the statute is constitutional applies, just as it does in a facial challenge." In re Gwenevere T., 2011 WI 30, ¶47, 333 Wis. 2d 273, 797 N.W.2d 854. However, while we presume the statute is constitutional, "we do not presume that the State applies statutes in a constitutional manner." Id., ¶48 (quoting Society Ins., 326 Wis. 2d 444, ¶27).

¶57 Because as-applied challenges turn on their facts, each one is different. Accordingly, we determine on a case-by-case basis whether a petitioner's constitutional rights have been transgressed. In re Gwenevere T., 333 Wis. 2d 273, ¶49.

¶58 As we have mentioned above in discussing the facial constitutionality of the cap, because no fundamental right or suspect class is at issue here, we apply a rational basis review. Smith, 323 Wis. 2d 377, ¶12. In an as-applied challenge, the challenger must prove beyond a reasonable doubt that as applied to him or her the statute is unconstitutional. Id. We will conclude that a statute has been applied in a constitutional manner "if the application of the statute bears a rational relation to a legitimate legislative objective." In re Gwenevere T., 333 Wis. 2d 273, ¶53.

¶59 Prior to considering the Mayos' circumstances, it is helpful to examine another as-applied challenge to the constitutionality of a statute that came before us in Blake, 370 Wis. 2d 1. In Blake, the plaintiff's childcare provider license was revoked due to legislation that required lifetime prohibition on granting a childcare license to persons convicted of certain criminal offenses. The plaintiff's license was

28

revoked because of her conviction for welfare fraud, an offense coming within the statutory proscription against licensing for childcare. Blake challenged the statute's constitutionality both facially and as applied to her.

¶60 We held that neither Blake's facial nor her as-applied challenge had merit. Blake asserted her right to equal protection was denied because of disparate treatment, in that others convicted of "dishonesty related offenses" did not suffer permanent denial of childcare licensure. Id., ¶46. We concluded, however, that Blake had "misidentifie[d] the proper scope for evaluating the classification." Id. Referring to a prior court of appeals case, we explained that the plaintiff identified "no evidence that she was treated differently from any similarly-situated childcare provider whose license was revoked under the new law." Id. (quoting Brown v. DCF, 2012 WI App 61, ¶43, 341 Wis. 2d 449, 819 N.W.2d 827). We concluded that because Blake was treated "in a manner consistent with the treatment of similarly situated providers . . . and [the plaintiff] has not presented evidence to the contrary, her as-applied equal protection claim fails." Blake, 370 Wis. 2d 1, ¶46.

¶61 As with the plaintiff in Blake, the Mayos have not presented any evidence that they were treated differently than others who are similarly situated. The Mayos argue that their noneconomic damages award is reduced by 95.46 percent when the cap is applied. However, as with the plaintiff in Blake, the Mayos focus their attention on themselves as opposed to

29

analyzing whether they are treated differently than other similarly-situated persons.

¶62 The Mayos were treated the same under the cap as any other persons for whom the jury has awarded noneconomic damages in excess of $750,000. The cap applies regardless of how much in excess of $750,000 the award; how drastic the injury suffered; the gender, age, or race of the plaintiff; or the extent of a health care provider's culpability. The Mayos certainly are very sympathetic plaintiffs because of the severe injuries that Ascaris Mayo has suffered. However, were we to construe the cap based on our emotional response to her injury, we would be substituting our policy choice for that of the legislature.

¶63 Further, the Mayos have not shown that the cap as applied to them is "arbitrary and not rationally related to a legitimate government interest." Smith, 323 Wis. 2d 377, ¶28. A continued point of contention in the Mayos' brief, as well as at oral argument, was that the Fund has very significant assets and, therefore, paying the Mayos would not endanger its solvency. However, the size of the noneconomic damages award as compared with the balance in the Fund from which the Mayos seek an additional $15 million in compensation is not relevant to their constitutional challenge.[16] The financial planning and maintenance of the Fund does not fall within the duties of the

---

[16] The Fund has already paid more than $7 million dollars in economic damages to the Mayos.

judiciary; we do not set premiums or choose the Fund's investments; we do not set the amount that the Fund must contain to meet potential expenditures for pending claims. Rather, we consider the legislature's creation of the Fund, the language of the enactment, the purposes it serves and whether it was applied consistent with those purposes in determining its validity.

¶64 Furthermore, the Wisconsin Constitution permits the legislature to eliminate common law causes of action altogether. Under Article XIV, Section 13 of the Wisconsin Constitution, the common law may be "altered or suspended by the legislature." A prominent example is worker's compensation, where the legislature has eliminated claims for noneconomic damages by workers against their employers. See Wis. Stat. § 102.03(2). However, in medical malpractice, the legislature chose to continue to allow medical malpractice plaintiffs to recover noneconomic damages, but limited the amount to $750,000.

¶65 Because we conclude that the $750,000 cap on noneconomic damages established by Wis. Stat. § 893.55 has been applied in rational relation to legitimate legislative objectives, § 893.55 is not unconstitutional as applied to the Mayos.

### III. CONCLUSION

¶66 We conclude that rational basis is the proper standard by which to judge the constitutionality of Wis. Stat. § 893.55; that § 893.55 is facially constitutional and constitutional as applied to the Mayos; and that Ferdon erroneously invaded the province of the legislature and applied an erroneous standard of

31

review.   Accordingly, we reverse the court of appeals' decision, overrule <u>Ferdon</u>, and conclude that the $750,000 cap on noneconomic damages in medical malpractice judgments and settlements is constitutional both facially and as applied to the Mayos.

¶67  Therefore, we reverse the court of appeals and remand to the circuit court to impose the $750,000 cap on noneconomic damages.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.

¶68  REBECCA GRASSL BRADLEY, J.  *(concurring).*  I join the majority opinion.  I write separately, however, to address the presumptions afforded a statute undergoing a constitutional challenge and the challenger's burden of proof.  The Mayos bring both facial and as-applied challenges to the $750,000 cap on noneconomic damages for medical malpractice claimants prescribed by Wis. Stat. § 893.55 (2015-2016); that is, the Mayos assert the statute is unconstitutional in every circumstance and as applied specifically to them.  See State v. Smith, 2010 WI 16, ¶10 n.9, 323 Wis. 2d 377, 780 N.W.2d 90 (discussing difference between facial and as-applied constitutional challenges).  The burden to prove a statute unconstitutional rests with the party challenging it.  For many years, this court has described that burden as a "heavy" one because the court presumes the legislation is constitutional, engages in every attempt to uphold it, and in a facial challenge, requires a party challenging a law to prove it "is unconstitutional beyond a reasonable doubt."  Id., ¶8.  To succeed in a facial challenge, a party must also show the law cannot be enforced under any circumstances.  State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63.  I refer to these elements of the burden collectively as "the rule" and because it constitutes the current state of the law, I am bound to apply it.

¶69 Regardless of the hurdles the court compels challengers to surmount, a statute either comports with the constitution or it does not.  Requiring a court to lend almost

unfettered deference to the legislature seems incompatible with our duty of ensuring the legislature does not exceed its constitutional powers. Indeed, imposing a burden of proof heavily weighted in favor of the legislature on matters of constitutional interpretation is an abdication of our core judicial powers to exercise impartial judgment in cases and controversies and to say what the law is. See generally Gabler v. Crime Victims Rights Board, 2017 WI 67, ¶37, 376 Wis. 2d 147, 897 N.W.2d 384 (2017). "[T]he judiciary are to declare a legislative Act void which conflicts with the constitution, or else that instrument is reduced to nothing." James B. Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harvard L. Rev. 129, 139 (1893) (citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178 (1803)).

¶70 Although I join the majority, I write separately to question the court's continued adherence to an evidentiary burden of proof when deciding a statute's constitutionality. Additionally, I write to clarify that the court's elimination of rational basis with bite as a standard of review should not be interpreted as relaxing the level of review applied to statutes implicating fundamental constitutional rights. I agree that it would be inappropriate to apply rational basis with bite in reviewing the statutory cap on non-economic damages, but I would preserve a meaningful standard of judicial review for laws encroaching on fundamental constitutional rights.

I

¶71 Under current law, we presume the statute in question is constitutional. Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶18, 237 Wis. 2d 99, 613 N.W.2d 849. We will decide otherwise only if a challenger proves the statute is unconstitutional beyond a reasonable doubt. Id., ¶19. A showing that the statute is "probably unconstitutional" or that its constitutionality is "doubtful" is insufficient to overcome the presumption. State v. Cole, 2003 WI 112, ¶11, 264 Wis. 2d 520, 665 N.W.2d 328.

¶72 A facial challenge requires near-absolute proof that any application of the statute is unconstitutional. But the "proof" required in such challenges is assuredly not evidentiary proof——it is a rather mixed bag of concrete and hypothetical proof sufficient to "establish[] the force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional." Dane Cty. Dep't of Human Services v. Ponn P., 2005 WI 32, ¶18, 279 Wis. 2d 169, 694 N.W.2d 344.

II

¶73 Debate about the propriety of the presumption and burden traces back centuries, indeed to our nation's founding. See generally Thayer, supra ¶2, at 140 ("When did this rule of administration begin? Very early.") (tracing the history of heightened deference to legislative acts in the states and the federal system to the American Revolution). In the late 18th century through the 19th century, both federal and state courts grounded their approach to determining the constitutionality of a statute in deference to the legislature. Id. at 142-43 n.1

3

(collecting examples of this rule's application by the United States Supreme Court and state courts in Massachusetts, New York, New Hampshire, Ohio, Louisiana, and Florida). Among the expressed rationales for such deference, courts uniformly agreed that heightened deference preserved the essential balance between the legislature's law-creating function and the judiciary's duty to "say what the law is." See id.

¶74 Arguing a case in a Massachusetts court, Daniel Webster identified a principal weakness of the rule, an argument that persists today:

> [M]embers of the legislature sometimes vote for a law, of the constitutionality of which they doubt, on the consideration that the question may be determined by the judges. . . . If . . . the judge is to hold it valid because its unconstitutionality is doubtful, in what a predicament is the citizen placed! . . . [I]f the question is not met and decided here [by the court] on principle, responsibility rests nowhere. . . . Judicial tribunals are the only ones suitable for the investigation of difficult questions of private right.[1]

Such "double deference" threatens the Constitution because both branches punt the issue to the other: "While the courts are deferring to the legislature, the legislature in turn is deferring to the courts. By this ruse, any scrutiny of legislation to ensure it is within the just powers of a legislature is avoided." Randy E. Barnett, Our Republican

---

[1] James B. Thayer, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harvard L. Rev. 129, 146 (1893).

Constitution:  Securing the Liberty and Sovereignty of We the People 128 (2016).

¶75 Like many other states, Wisconsin courts employed the rule, although the rationale for its adoption was never fully articulated.  As early as 1842, when Wisconsin remained a territory, the precursor to this court applied a different variation of the rule whereby "[t]o justify a court in declaring a law of the legislature unconstitutional, the case must be clear and manifest."  Norton v. Rooker, 1 Pin. 195, 204 (1842) (emphasis added); see also Dickson v. State, 1 Wis. 122, 126 (1853) ("clearly").  Courts sometimes equivocated between requiring proof that was "clear and manifest" and today's rule requiring proof "beyond a reasonable doubt," often resulting in the two standards being equated.  See, e.g., Smith v. Odell, 1 Pin. 449, 455 (1844) ("The judiciary is a co-ordinate branch of the government, and has a right to declare an act of the legislature void, when repugnant to the constitution, but it must be a very clear and unequivocal case to induce a court to pronounce an act of the legislature unconstitutional.  When a judge is convinced that an act is unconstitutional, it is his duty to set it aside, but he must examine it with every legal intendment and presumption in favor of its validity.  He is not to resort to a forced, rigid or doubtful construction of an act for the purpose of determining its unconstitutionality.  Before the court will declare an act of the legislature unconstitutional, a case should be presented in which there is no rational doubt." (emphasis added) (citations omitted)); see

also Christopher R. Green, Clarity and Reasonable Doubt in Early State-Constitutional Judicial Review, 57 S. Tex. L. Rev. 169, 171 (2015) (suggesting that, in some instances, courts took the two standards and equated them "as alternative verbal formulations of the same rule").

¶76 In 1861, this court borrowed from the Michigan Supreme Court in expressing the rule as follows: "that to warrant us in declaring a statute unconstitutional, we should be able to lay our finger on the part of the constitution violated, and that the infraction should be clear and free from a reasonable doubt." State ex rel. Chandler v. Main, 16 Wis. 398, 415 (1863) (quoting Tyler v. The People, 8 Mich. 320, 333 (1860)). The precursor to "beyond a reasonable doubt" of "clear and free from a reasonable doubt" apparently was imported from a foreign jurisdiction.

¶77 In Wisconsin's early history, the presumption of constitutionality could, in theory at least, be rebutted. For example, this court opined that "[i]t follows, logically, that the legitimacy of legislative regulation . . . must be tested with reference to appropriateness of ends sought to be attained and also of means to such ends." State ex rel. McGrael v. Phelps, 144 Wis. 1, 22, 128 N.W. 1041 (1910). In practice, successful rebuttal of the presumption is rare, particularly in facial challenges, which require the challenger to identify an unlimited number of circumstances to which the statute may apply and successfully show the law cannot be enforced in any of them.

¶78 In federal courts, judicial deference has waned in recent decades. "[T]he strength of the presumption [of constitutionality] has weakened. This weakening is suggested both by shifts in the language that the Court has used to describe the presumption and by the significant modern increase in the rate at which the Court has invalidated federal statutes." Edward C. Dawson, Adjusting the Presumption of Constitutionality Based on Margin of Statutory Passage, 16 U. Pa. J. Const. L. 97, 108 (2013). No United States Supreme Court case since 1984 has applied a strong presumption of constitutionality in challenges to federal statutes. Id. at 109, n.43 ("[W]hile there are nine majority decisions between 1931 and 1984 describing the presumption of constitutionality afforded federal statutes as 'strong,' . . . no majority decisions since 1984 mention a 'strong' presumption of constitutionality").[2] The rule seems to have essentially disappeared from United States Supreme Court jurisprudence. Id. ("The 'beyond a reasonable doubt' formulation has disappeared."). Our court of appeals noted this in Guzman v. St. Francis Hosp., Inc., 2001 WI App 21, ¶4 n.3, 240 Wis. 2d 559, 568, 623 N.W.2d 776, but lacking the power to overrule this court's precedent, it was compelled to apply the rule.

---

[2] The strong presumption of constitutionality has not reappeared in any United States Supreme Court decision published in 2013 or thereafter.

7

¶79 In its place, the United States Supreme Court sometimes employs a "plain showing" standard of review: "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." United States v. Morrison, 529 U.S. 598, 607 (2000). Even more recently, the United States Supreme Court harkened back to a 19th century expression of the standard: "'Proper respect for a co-ordinate branch of the government' requires that we strike down an Act of Congress only if 'the lack of constitutional authority to pass [the] act in question is clearly demonstrated.'" Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012) (citing United States v. Harris, 106 U.S. 629, 635 (1883)).

¶80 This court continues to reflexively apply the rule without any acknowledgement of the United States Supreme Court's reformulation of the standard. See, e.g., Voters with Facts v. City of Eau Claire, 2018 WI 63, ¶65, ___ Wis. 2d ___, ___ N.W.2d ___ ("All legislative acts are presumed constitutional and we must indulge every presumption to sustain the law." (quoting Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶13, 358 Wis. 2d 1, 851 N.W.2d 337)); State v. Grandberry, 2018 WI 29, ¶12, 380 Wis. 2d 541, 910 N.W.2d 214; Blake v. Jossart, 2016 WI 57, ¶27, 370 Wis. 2d 1, 884 N.W.2d 484, cert. denied, 137 S. Ct. 669 (2017) ("A party challenging a statute overcomes the strong presumption of constitutionality only by demonstrating that the statute is unconstitutional beyond a reasonable doubt." (citing

8

Aicher, 237 Wis. 2d 99, ¶18)); Winnebago Cty. v. Christopher S., 2016 WI 1, ¶33, 366 Wis. 2d 1, 878 N.W.2d 109, cert. denied sub nom., Christopher S. v. Winnebago Cty., 136 S. Ct. 2464 (2016) ("Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality." (quoting State v. Dennis H., 2002 WI 104, ¶12, 255 Wis. 2d 359, 647 N.W.2d 851)). The United States Supreme Court will strike down statutes upon a "plain showing" of their unconstitutionality, or when their unconstitutionality is "clearly demonstrated." The latter wording is strikingly similar to the "clear and manifest" standard applied in very early Wisconsin case law.

¶81 Legal scholarship advocating for a weaker presumption of constitutionality (or its elimination altogether) sustains the ongoing debate over the proper balance of constitutional powers between the legislature and the judiciary. See, e.g., Randy Barnett, Restoring the Lost Constitution: The Presumption of Liberty 273 (2003) (arguing that courts should change the standard from a "presumption of constitutionality" to a "presumption of liberty" wherein the government, not the challenger, must prove the "necessity and propriety of its restrictions on liberty"); Green, supra ¶8, at 171 (suggesting that the "the middle requirement, clarity, has the best historical pedigree" and should be the standard). They present many logical, practical, and, of greatest importance,

constitutional reasons for altering the burden of proof in constitutional challenges to statutes.

¶82 To begin with, the current standard in Wisconsin is unworkable, given that a party not only must challenge the legislature's expressed reasoning behind implementing a statute, but must also disprove any rational speculation that could be invoked to support the statute's constitutionality——regardless of whether the legislature actually relied upon that rationale in adopting it. See David M. Burke, The Presumption of Constitutionality Doctrine and the Rehnquist Court: A Lethal Combination for Individual Liberty, 18 Harv. J. L. & Pub. Pol'y 73, 86 (1994-95) (a petitioner must show there is no conceivable interpretation of the Constitution that could support the statute); id. ("'[I]f any state of facts reasonably may be conceived to justify' a legislative determination, then it is 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision.'" (first quoting McGowan v. Maryland, 366 U.S. 420, 426 (1961); then quoting Flemming v. Nestor, 363 U.S. 603, 612 (1960) (footnotes omitted))); see also Barnett, supra ¶14, at 228 (asking rhetorically, "who 'realistically' is in the best position to present a court with empirical information for or against the necessity" and answering implicitly, the government). If the justifications available for a challenged law are not tied to the actual reasons the law was passed, then the constitutional validity of a statute rests on the imagination of the State's lawyers.

10

¶83 It has never been clear why courts choose to apply an evidentiary burden of proof for establishing guilt in criminal cases in assessing the constitutionality of a statute. This court previously explained away this concern:

> While this burden of proof is often associated with the requisite proof of guilt in a criminal case, in the context of a challenge to the constitutionality of a statute, the phrase "beyond a reasonable doubt" expresses the "force or conviction with which a court must conclude, as a matter of law, that a statute is <u>unconstitutional</u> before the statute or its application can be set aside."

<u>League of Women Voters of Wis. Educ. Network, Inc. v. Walker</u>, 2014 WI 97, ¶17, 357 Wis. 2d 360, 851 N.W.2d 382 (emphasis added) (quoting <u>Ponn P.</u>, 279 Wis. 2d 169, ¶18). If "beyond a reasonable doubt" means something different in assessing the constitutionality of statutes, we should not transfer the exact same words from a criminal evidentiary standard applied to <u>facts</u> into an analysis of the <u>law</u>. See <u>Island Cty. v. State</u>, 955 P.2d 377, 386 (Wash. 1998) (Sanders, J., concurring) ("[L]egal questions are not ordinarily presumptive candidates because the law is at hand. Thus, all courts determine legal issues de novo." (citations omitted)). In assessing the constitutionality of a law, the court examines just that: the law. See <u>Appling v. Walker</u>, 2014 WI 96, ¶18, 358 Wis. 2d 132, 853 N.W.2d 888. It does not examine the law in the same way the finder of fact in a criminal trial evaluates witness' factual testimony for credibility or reliability in order to ascertain the defendant's guilt or innocence.

11

¶84 Rather, as the constitutional body vested with the power to say "what the law is," the judiciary evaluates a statute for its fidelity to the constitution, and "an act of the legislature, repugnant to the constitution, is void." Marbury, 5 U.S. (1 Cranch) at 177. When a law contravenes the constitution, it is our duty to say so. The "beyond a reasonable doubt" standard interferes with this judicial responsibility. Applying this standard places courts in an absurd position: We could determine a law is more likely than not unconstitutional, and we would still uphold it.[3] We could even conclude a party has shown clearly and convincingly that a law is unconstitutional, and still we would sustain it.[4] This scheme of review scrambles the constitutional roles of the judiciary and the legislature, making legislators the judges of their own laws. "If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the

---

[3] Reviewing an issue for "proof by a preponderance of the evidence," i.e., proof that is "more likely than not" true, encompasses the lowest burden of proof used in ordinary civil cases. See Kruse v. Horlamus Indus., Inc., 130 Wis. 2d 357, 362-63, 387 N.W.2d 64 (1986); State v. Wanta, 224 Wis. 2d 679, 693, 592 N.W.2d 645 (Ct. App. 1999). It requires the trier of fact to determine the existence of a fact "to a reasonable certainty by the greater weight of the credible evidence." Kruse, 130 Wis. 2d at 362-63.

[4] "This burden, while greater than required in ordinary civil cases, is not as great as 'beyond a reasonable doubt' used in criminal cases." City of Madison v. Geier, 27 Wis. 2d 687, 691, 135 N.W.2d 761 (1965).

12

natural presumption, where it is not to be collected from any particular provisions in the Constitution." The Federalist No. 78 at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The "beyond a reasonable doubt" standard also disrupts the hierarchy of laws by making statutes superior to the constitution.

> The Constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law; if the latter part be true, then written Constitutions are absurd attempts on the part of the people to limit a power in its own nature illimitable.

Marbury, 5 U.S. (1 Cranch) at 177. Judicial respect for its co-equal branch, the legislature, cannot amount to surrender of judicial power or abdication of judicial duty.

¶85 The burden of proof in criminal cases purportedly is rooted in Blackstone's observation that "it is better that ten guilty persons escape than one innocent suffer." 4 William Blackstone, Commentaries *358. This precept does not translate in the context of examining a statute's constitutionality: Is it better that the constitution be violated ten times lest one constitutional law be struck down? Is it better that we deny the people's constitutional rights ten times to avoid mistakenly striking down a single constitutional law? Notably, the consequences of upholding unconstitutional laws are not confined to a single party in a single case. Rather, failure to strike

13

down an unconstitutional law harms all of the people of this state in potential perpetuity.

¶86 Employing the "beyond a reasonable doubt" burden of proof in judging a statute's constitutionality substantiates one of the Framers' chief concerns: that Legislatures should not be the "constitutional judges of their own powers." Burke, supra ¶15, at 90 ("[I]n a constitutional system of delegated authority it 'cannot be the natural presumption' that the members of Congress are to be regarded as 'the constitutional judges of their own powers . . . .'" (citing The Federalist No. 78, supra ¶17, at 467 (Alexander Hamilton)).

¶87 Under the current framework, in contrast to the structural separation of powers our framers envisioned, judicial deference gives the legislature both the pen and the gavel over their own laws, and imposes a "tremendous burden" on individuals attempting to limit the constitutional overreach of legislative power. Burke, supra ¶15, at 90. Imposing a "beyond a reasonable doubt" standard is currently at odds with the constitutional principle that the legislature, not the people, should be the one to identify the legislature's source of power. Id. at 84 ("The powers of Congress . . . have as their sole origin a Constitution which delegates and limits powers. It necessarily follows, then, that the burden lies with Congress to point to its source of power.").

¶88 This court recently reiterated the importance of the separation of powers in establishing and preserving a government of, by, and for the people. Gabler, 376 Wis. 2d 147, ¶39 ("If

14

the judiciary passively permits another branch to arrogate judicial power unto itself, however estimable the professed purpose for asserting this prerogative, the people inevitably suffer. . . . [T]he people lose their independent arbiters of the law, the balance of powers tips, and the republican form of government is lost."). We recently jettisoned judicial deference long afforded to interpretations of law by administrative agencies. Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ___ Wis. 2d ___, ___ N.W.2d __. The time is ripe for this court to embrace its constitutional duty to protect the people from encroachments by the legislature on constitutional rights.

¶89 A strong presumption of constitutionality empowers legislators to serve as "judges in their own case when a citizen claims that a law restricting his or her liberty is irrational or arbitrary." Barnett, supra ¶7, at 245. In Federalist 10, James Madison warned that "a body of men are unfit to be both judges and parties at the same time," recognizing that "many of the most important acts of legislation" are "judicial determinations." The Federalist No. 10, supra ¶17, at 79 (James Madison). Serving as the protector of constitutional rights ultimately rests with "courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist No. 78, supra ¶17, at 466 (Alexander Hamilton) (emphasis added).

15

¶90 Replacing the "beyond a reasonable doubt" burden with one requiring a "plain showing" or simply clarity in establishing the unconstitutionality of a statute, as the United States Supreme Court did decades ago, would restore the balance of power between the judiciary and the legislature in Wisconsin. Such a standard of review would conserve the legislature's constitutional lawmaking function while reinstating the courts' role as the "bulwarks of a limited Constitution against legislative encroachments . . . ." The Federalist No. 78, supra ¶17, at 469 (Alexander Hamilton).

¶91 The Constitution's supremacy over legislation bears repeating: "the Constitution is to be considered in court as a paramount law" and "a law repugnant to the Constitution is void, and. . . courts, as well as other departments, are bound by that instrument." See Marbury, 5 U.S. (1 Cranch) at 178, 180.

III

¶92 The majority aptly criticizes the Ferdon court's application of "rational basis with teeth" to strike the prior cap on noneconomic damages for usurping the legislature's policymaking role. Majority op., ¶32. As the State accurately argued in its amicus brief, "the cap's level is a quintessentially legislative judgment" which makes it the prerogative of the legislature to set. The cap implicates no constitutional rights whatsoever; as plaintiffs' counsel conceded at oral argument, the legislature could set the cap at zero——thereby eliminating the recovery of noneconomic damages altogether——without offending the constitution. Recovery of

16

such damages is a matter of common law, not constitutional law. The legislature retains full authority to define, limit, or abrogate common law causes of action. Aicher, 237 Wis. 2d 99, ¶51. The Wisconsin Constitution expressly permits this. Majority op., ¶64. And because the cap treats all medical malpractice plaintiffs exactly the same, no equal protection or due process inquiry is necessary.

¶93 Because the majority opts to apply rational basis review in this case, I would clarify that this lower level of review is appropriate for laws that confer a benefit, such as the system of guaranteed recovery for medical malpractice claimants we consider here. However, when laws are alleged to impair fundamental constitutional rights, courts must apply a higher level of scrutiny. Porter v. State, 2018 WI 79, ___ Wis. 2d ___, ___ N.W.2d __ (R. Grassl Bradley, J., and Kelly, J., dissenting).

IV

¶94 Wisconsin courts must afford appropriate deference to legislatures in their lawmaking function. Legislators are the people's representatives, elected to enact laws that reflect the policy preferences of the people. However, the constitution imposes limits on that broad power; the legislature may not enact laws that infringe constitutional rights. Under our structural separation of powers, the people task the judiciary with the ultimate authority to declare legislative acts unconstitutional. The judiciary does not fulfill this duty if it subordinates its independent judgment to the legislature's by

17

making legislative acts superior to the constitution. "[T]here is no liberty, if the judiciary power be not separate from the legislative." 7 B. De Montesquieu, Spirit of the Laws 152 (Nugent ed., 1823).

¶95  I join the majority in upholding the statutory cap on noneconomic damages in medical malpractice actions set forth in Wis. Stat. § 893.55, which does not implicate or offend any constitutional right. I write separately to urge this court to reconsider its application of the "beyond a reasonable doubt" standard in cases that present constitutional challenges.

¶96  I respectfully concur.

¶97  I am authorized to state that Justice DANIEL KELLY joins this concurrence.

18

¶98 ANN WALSH BRADLEY, J. *(dissenting).* After a harrowing and unimaginable ordeal that resulted in the amputation of all four of Ascaris Mayo's extremities, the majority denies Ascaris and Antonio Mayo 95 percent of the recovery to which a jury determined they are entitled. The majority restricts the Mayos' recovery based on Wisconsin's statutory cap on noneconomic damages in medical malpractice cases, which it now declares to be constitutional. See Wis. Stat. § 893.55.

¶99 This is not the first time this court has addressed the constitutionality of a cap on noneconomic damages in medical malpractice actions. In Ferdon ex rel. Petrucelli v. Wisconsin Patients Comp. Fund, the court determined that a medical malpractice noneconomic damages cap of $350,000 violated the constitutional guarantee of equal protection. 2005 WI 125, ¶10, 284 Wis. 2d 573, 701 N.W.2d 440.

¶100 Ferdon exhaustively, and correctly, analyzed the constitutional infirmities of a damage cap of $350,000. The only difference between this case and Ferdon is that the medical malpractice noneconomic damages cap is set at $750,000 rather than $350,000.

¶101 Raising the cap by $400,000 does not fix the fundamental constitutional problems with the damage cap that the Ferdon court identified. The cap still makes the most severely injured bear the greatest burden in violation of equal protection.

1

¶102 I agree with a unanimous court of appeals that determined that the statutory cap on noneconomic damages remains unconstitutional.[1] The cap imposes "an unfair and illogical burden only on catastrophically injured patients, thus denying them the equal protection of the laws." Mayo v. Wis. Injured Patients and Families Compensation Fund, 2017 WI App 52, ¶1, 377 Wis. 2d 566, 901 N.W.2d 782.

¶103 Ferdon identified several areas of constitutional infirmity with regard to the $350,000 cap at issue. As the court of appeals in this case explained, the Ferdon court concluded that the $350,000 damages cap then at issue lacked a rational basis because: (1) the existence or nonexistence of noneconomic damages caps does not affect doctors' migration; (2) defensive medicine is not susceptible to accurate measurement and does not contribute significantly to the cost of health care; (3) the correlation between noneconomic damages caps and lower medical malpractice premiums or overall health care costs is weak; and (4) the cap was unnecessary to the financial integrity of the Fund. Mayo, 377 Wis. 2d 566, ¶20 (citing Ferdon, 284 Wis. 2d 573, ¶¶168, 174, 166, 158).

¶104 Simply raising the cap from $350,000 to $750,000 does not magically transform any of these considerations into

---

[1] Although Judge Brash concurred, taking the position that the damages cap is unconstitutional as applied to the Mayos rather than facially unconstitutional, the court of appeals was unanimous that the damages cap violates the constitutional guarantee of equal protection.

rational bases for the legislature's action.[2]  I agree with the court of appeals' analysis on each point.

---

[2] The legislature sets forth the damage cap's objectives in Wis. Stat. § 893.55(1d)(a).  The four bases advanced are:

1. Protecting access to health care services across the state and across medical specialties by limiting the disincentives for physicians to practice medicine in Wisconsin, such as the unavailability of professional liability insurance coverage, the high cost of insurance premiums, large fund assessments, and unpredictable or large noneconomic damage awards, as recognized by a 2003 U.S. [C]ongress joint economic committee report, a 2003 federal department of health and human services study, and a 2004 office of the commissioner of insurance report.

2. Helping contain health care costs by limiting the incentive to practice defensive medicine, which increases the cost of patient care, as recognized by a 2002 federal department of health and human services study, a 2003 U.S. [C]ongress joint economic committee report, a 2003 federal government accounting office study, and a 2005 office of the commissioner of insurance report.

3. Helping contain health care costs by providing more predictability in noneconomic damage awards, allowing insurers to set insurance premiums that better reflect such insurers' financial risk, as recognized by a 2003 federal department of health and human services study.

4. Helping contain health care costs by providing more predictability in noneconomic damage awards in order to protect the financial integrity of the fund and allow the fund's board of governors to approve reasonable assessments for health care providers, as recognized by a 2005 legislative fiscal bureau memo, a 2001 legislative audit bureau report, and a 2005 office of commissioner of insurance report.

Wis. Stat. § 893.55(1d)(a)1.-4.  Although these four reasons are more detailed, they essentially present the same justifications that were tested and rejected in Ferdon.  See Mayo v. Wis. Injured Patients and Families Comp. Fund, 2017 WI App 52, ¶27, 377 Wis. 2d 566, 901 N.W.2d 782.

¶105 First, as did the <u>Ferdon</u> court, the court of appeals here concluded that the "current noneconomic damages cap is not rationally related to the legislative objective of retaining physicians in Wisconsin." <u>Mayo</u>, 377 Wis. 2d 566, ¶21. It reached this conclusion because data demonstrates that the number of physicians participating in the Fund has increased each year since <u>Ferdon</u>, and that many states with no damages cap at all "actually have higher physician retention rates than Wisconsin."[3] <u>Id.</u>

¶106 Second, in accord with the <u>Ferdon</u> court, the court of appeals here determined that the damages cap is "not rationally related to the legislative objective of curtailing the practice of defensive medicine." <u>Id.</u>, ¶22. Rather, the record demonstrates that the financial impact of defensive medicine is not readily measurable, and this has not changed in the time since <u>Ferdon</u> was decided. <u>Id.</u> Further, the requirements that doctors have primary medical malpractice coverage and make contributions to the Fund mean that there is no risk of a doctor facing personal liability for a judgment. <u>Id.</u> As the court of appeals stated, "[t]his lack of uninsured personal liability would logically appear to remove any incentive to practice 'defensive medicine.'" <u>Id.</u>

---

[3] For example, our neighboring state of Minnesota, which has no damage cap, retains its physicians at a higher rate than does Wisconsin. <u>See</u> Ass'n of American Medical Colleges, 2011 State Physician Workforce Data Book 54-55 (Nov. 2011), https://www.aamc.org/download/263512/data/statedata2011.pdf.

4

¶107 Third, the court of appeals concluded that, as in Ferdon, "the record before us does not demonstrate any correlation between medical malpractice premiums and caps on noneconomic damages." Id., ¶24. Other jurisdictions, and even medical malpractice insurers, have also failed to establish such a connection. Id.

¶108 Finally, as the court of appeals determined, the record does not demonstrate that the integrity of the Fund rises and falls based on the damages cap. The Ferdon court observed that "the Fund has flourished both with and without a cap." Ferdon, 284 Wis. 2d 573, ¶158. This remains true today. The Fund's assets have grown, while both claims and payments have decreased. As the court of appeals concluded, "[i]t is obvious that the Fund's financial solvency has not been negatively impacted by claims when, in fact, the Fund's assets have grown."[4] Mayo, 377 Wis. 2d 566, ¶25.

¶109 Before concluding, I observe that the majority's analysis and its overruling of Ferdon depart from the time-honored principle of stare decisis. We decided Ferdon only thirteen years ago. "[R]espect for prior decisions is fundamental to the rule of law." Johnson Controls, Inc. v.

---

[4] According to the Fund's 2016 Functional and Progress Report, as of June 30, 2016, the assets of the Fund totaled over $1.3 billion, over $878 million of which is surplus. Wisconsin Injured Patients and Families Compensation Fund, Office of the Commissioner of Insurance (OCI), 2016 Functional and Progress Report 13-14, https://oci.wi.gov/Documents/Funds/IPFCFANNRPT16.pdf. This is more than ample to cover the Fund's obligations.

5

Emp'rs Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257 (2003).

¶110 "Stare decisis is the preferred course of judicial action because it promotes evenhanded, predictable, and consistent development of legal principles . . . and contributes to the actual and perceived integrity of the judicial process." Id., ¶95. "The decision to overturn a prior case must not be undertaken merely because the composition of the court has changed." Id.; see also Bartholomew v. Wisconsin Patients Comp. Fund and Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶32, 293 Wis. 2d 38, 717 N.W.2d 216 ("No change in the law is justified by a change in the membership of the court[.]").

¶111 Equal protection guarantees that people similarly situated are treated similarly. State ex rel. Harr v. Berge, 2004 WI App 105, ¶5, 273 Wis. 2d 481, 681 N.W.2d 282. Yet, the $750,000 damage cap singles out the most severely injured and treats them differently. It places the largest burden on them and guarantees that this specific, vulnerable class of injured patients will receive but a tiny fraction of the compensation due.

¶112 Only those with the most catastrophic injuries will be denied a full and fair damages award. Under the majority's analysis, the Mayos will receive merely five percent of what a jury assessed was due for their noneconomic damages, while those less severely injured will get 100 percent. It makes no sense that those who are injured most get the least. This senseless

6

and unequal result is compounded by the lack of a rational basis for the cap, rendering it unconstitutional.

¶113 This court got it right in <u>Ferdon</u>, as did the unanimous court of appeals in this case.

¶114 For the reasons set forth above, I respectfully dissent.

¶115 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.